**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
John K. Sherwood, Esq. (JS 2453)
Wojciech F. Jung, Esq. (WJ 2047)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to Debtor and
Debtor-in-Possession*

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>OCEAN PLACE DEVELOPMENT LLC,<br>A Delaware Limited Liability Company,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.  11-14295 (     ) |

### DECLARATION OF WILLIAM R. DIXON, JR.
### IN SUPPORT OF FIRST DAY MOTIONS

WILLIAM R. DIXON, JR., of full age, being duly sworn according to law, upon his oath deposes and states:

1.I am the Vice-President of TLC New Jersey Corp., a Delaware corporation, manager of Ocean Place Development LLC ("OPD" or the "Debtor").

2.In such capacity, I have detailed knowledge of and experience with the business and financial affairs of OPD, a limited liability company duly organized under and existing pursuant to the laws of the State of Delaware.

3.I am responsible for, among other things, devising and implementing the strategies for the Debtor and for overseeing the Debtor's chapter 11 process, including,

---

[1] The location of the Debtor's headquarters and its service address is Ocean Place Resort & Spa, One Ocean Blvd., Long Branch, NJ  07740.

25267/2
02/15/2011 16745063.1

inter alia, (i) understanding the business and financial affairs of the Debtor; (ii) developing a cash flow analysis and assessing the current liquidity position of the Debtor; (iii) exploring and implementing various restructuring strategies for the Debtor, and (iv) serving as a principal contact with the creditors of the Debtor. Accordingly, I am familiar with the Debtor's books and records, and I have acquired extensive knowledge of the Debtor and its day-to-day operations and business affairs, including its assets, liabilities and historical operations.

4. On February 15, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

5. The Debtor intends to operate its business as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code. I am advised by counsel that this Court has jurisdiction over this chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409.

6. This Declaration is intended to explain the circumstances leading up to the Debtor's chapter 11 case, to provide general information about the Debtor and its business operations, and to outline the "first day" pleadings that are being filed. The factual statements in this Declaration are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents and/or my opinions based on my experience and knowledge of the Debtor's operations and financial condition.

**I.    Company History, Organization and Structure[2]**

7. Tiburon Ocean Place, LLC, the related predecessor to OPD, originally purchased the landmark property generally known as the Ocean Place Resort & Spa in

---

[2] A true and correct copy of a corporate chart of OPD and is attached hereto as Exhibit "A".

2000, chiefly as an operating hotel and resort with certain zoning entitlements for potentially major additional development. In 2006, the property was refinanced with the current secured loans, and all of the assets and liabilities of Tiburon Ocean Place, LLC were simultaneously transferred into OPD.

8. The resort property is located on the Atlantic beachfront in Long Branch, New Jersey, just 55 miles south of New York City and 82 miles north of Atlantic City. The existing resort is sited on 17-acres featuring approximately 1,000 feet of ocean frontage and is improved with a 254-room hotel that includes 40,000 square feet of meeting space, three restaurants, a bar/lounge, a full-service spa, and numerous resort amenities. An aerial – west view of this property is attached hereto as Exhibit "B".

9. The Debtor has generated positive earnings from operations every year since acquisition. Steady growth in net operating income was recorded in the years 2003 through 2007. Like many similar properties, the economic declines from 2007 through April 2010 severely harmed revenues and the net operating income from the property. However, since April of 2010, revenues have begun to recover and "trailing 12 months" net operating income of the property has more than doubled.

10. Today, operational prospects appear to be very positive with significant to substantial improvements in the hotel operating environment expected to continue through the year 2014. Net operating income of the property for 2010 was $3,546,729, with a 26% increase in net operating income to $4,489,921 budgeted for 2011 by West Paces Hotel Group LLC, the resort's managing agent.

11. For 25 years, Long Branch has proceeded on a major redevelopment initiative that seeks to establish the City as a premier resort destination and enhance its year round appeal. One example of this revitalization is Pier Village, a successful commercial and residential mixed use development, the first phase of which was built in 2005 and is located adjacent and immediately to the south of Ocean Place Resort & Spa. This first phase of the Pier Village development consists of 320 rental apartments and

more than 100,000 square feet of retail shops that have maintained high occupancy levels since opening. A second phase was also built out and completed, and the third and final phase is in the final approval and planning process.

12. Another adjacent and highly successful project is Beachfront North, which is a residential community located immediately to the north of Ocean Place Resort & Spa and features a New England design. Built in 2005, Beachfront North is comprised of the Bluffs and the Grand Resorts, which consist of 104 townhomes and 179 condominium units, respectively, which have been sold out in a successful development. Minor additional development at the north end of this project is now underway which, when complete, will fully build out this development.

13. On August 22, 2007, OPD signed a Redevelopment Agreement with the City of Long Branch and other agencies, providing for substantial and specific development on the site to include 60 new hotel rooms, 200 "condo-hotel" units, 274 residential units, 250,000 square feet of retail space and 103,000 square feet of office space. With the proposed redevelopment, Ocean Place Resort & Spa would be the centerpiece of the entire Long Branch Oceanfront Redevelopment and the largest oceanfront resort and conference center on the New Jersey shore between New York City and Atlantic City. The development embodied in the Redevelopment Agreement (if built out) would increase the improved square footage of the property approximately 700% from the current 214,481 square feet to 1,496,163 square feet. With its location in a high traffic corridor, financial opportunities are major for a flexible redevelopment of this property that is sensitive to the specifics of demand over the coming years. Due to the flexibility required to meet evolving market conditions, it is expected that the ultimate build out of this property, subject to City and various agency approvals, will be similar to ( but not identical to) that embodied in the Redevelopment Agreement in place for this property.

14. The number of people employed full time at the Debtor's property ranges, depending on the season, between approximately 95 and 340. The employees are

employed and paid by the resort's property manager, West Paces Hotel Group, LLC ("West Paces") pursuant to the terms of an Operating Agreement dated October 24, 2005. The costs of the employees at the resort are part of the "Gross Operating Expenses" that are reimbursed to West Paces under the Operating Agreement.

## II. The Debtor's Debt Structure

15. The property is pledged to secure two promissory notes with an aggregate balance of approximately $56,606,400. Both notes are held by the same secured lender, AFP-104 Corp. (the "Lender"), whose mailing address is: c/o United Capital Corp., 9 Park Place, 4th Floor, Great Neck, New York 11021. The secured loans matured and became due on January 9, 2008. Despite the prior performance of OPD, meeting all of its loan obligations and the lack of any prior default whatsoever, the Lender refused to grant an extension at maturity of the secured loans and immediately imposed late payment penalties and the default rate of interest, approximately doubling the required debt service payments. Monthly debt service on the two secured loans was paid in full from the Debtor's cash accounts at the default interest rates until January of 2010.

16. Prior and subsequent to the date of maturity of the secured loans, OPD solicited a full refinance of the secured obligations from over 100 prospective lenders without success due to the withdrawal of virtually the entire lending community from the business of making commercial loans triggered by the global financial meltdown and economic chaos. Various formal and informal "workout" proposals submitted by the Debtor were not acceptable to the Lender.

17. From inception of the secured loans, operating expenses for the property under the terms of the loan documentation have been paid from a "lockbox" under the control of the Lender and its loan servicer. Within the last 60 days, the Lender has swept $3,000,000 or more of net operating cash of the Debtor held in the lockbox accounts and has applied these funds to pay down its loans and pay certain of its legal and other

expenses. Within the last several weeks, the Lender has refused to approve the payment of property and liability insurance premiums from the lockbox for coverage placed by the Debtor beginning on December 1, 2010, which leaves the property and the Debtor severely exposed to loss from possible property damage and liabilities incurred in operating the business.

18. There is substantial value to the existing hotel and resort including the modest value-added improvements which could be made to the property prior to consideration of the value of major redevelopment opportunities. Substantial current and future value exists due to the rapidly improving operating environment for the property given the economic recovery now occurring, which appears to be led by, among others, the hotel industry. There is also an immediate specific improvement to operations which can be achieved through operating efficiencies available through the rejection of the Operating Agreement with West Paces. This change could add $1 million or more to the annual net operating income and increase significantly the value of the property. When the major development potential of this property is considered together with the value of the existing facilities, a value of this property is indicated which exceeds the amount of the secured indebtedness. In general, the Lender is over secured by an equity cushion which is increasing and which can be expected to continue to increase substantially as the economic recovery continues, certain operational changes to the property are implemented and the Debtor takes further action regarding the redevelopment of its property.

19. As of the Petition Date, the Debtor had aggregate unsecured debts totaling approximately $60 million. This debt includes, but is not limited to, trade payables, utilities, insurance, unsecured notes, professional fees and employee related expenses.

## III.  First Day Matters

20. The Debtor, with the approval of the Court, proposes to maintain existing operations at the property and full employment of its employee base in a manner such that resort guests will generally be unaware of any operational changes or any change in conditions due to the contemplated financial reorganization of the Debtor. All catering functions of this major site for such events will be honored and continue to be booked. All customer programs such as gift cards, memberships and other promotions shall be honored and pursued to the fullest extent. On the developmental side, the Debtor will work with the City of Long Branch for appropriate development of this site and to provide for the discharge of obligations which are necessary to proceed with the successful redevelopment of the site.

21. In order to facilitate its orderly transition into chapter 11, the Debtor has filed the following first day motions (the "First Day Motions") contemporaneously herewith and has requested that the Court consider them on an expedited basis:

(a) **Motion for an Order Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code (1) Authorizing Use of Cash Collateral, (2) Granting Liens and Super-Priority Administrative Expense Status, (3) Providing Adequate Protection and (4) Scheduling and Approving the Form and Method of Notice of Final Hearing.**

(b) **Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363, 345(b), 1107, and 1108 and Federal Rule of Bankruptcy Procedure 6004(h), (A) Authorizing the Debtor to (i) Maintain its Existing Bank Accounts and Cash Management System, and (ii) Continue to Use its Existing Business Forms and Records, (B) Waiving Compliance with Investment Guidelines Pursuant to 11 U.S.C. § 345(b); (C) Providing the United States Trustee with a 60-day Period to Object to Said Order Before it Becomes a Final Order; and (D) Granting Related Relief.**

(c) **Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 507(A)(4) and 507(A)(5) (i) Authorizing the Debtor to Pay Certain Unpaid Pre-Petition Employee-Related Expenses and Employee Insurance Expenses, and (ii) Directing All Banks to Honor Pre-Petition Checks For Payment of Pre-Petition Employee-Related Expenses and Employee Insurance Expenses.**

22. For a more detailed description of these motions, the Debtor respectfully refers the Court to the First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motion shall control.

23. As a result of my first-hand experience, and through my review of various materials and information, discussions with the Debtor's representatives, and discussions with the Debtor's outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in the First Day Motions, (b) the need for the Debtor to transition into chapter 11 smoothly, and (c) the deleterious effects upon the Debtor of not obtaining such relief.

24. I have reviewed each of the First Day Motions (including the exhibits attached thereto) and, to the best of my knowledge and belief, the facts set forth therein are true and correct. Such representation is based upon my review of various materials and information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth in each of the First Day Motions.

25. The relief sought in each of the First Day Motions will minimize the adverse effects of the instant chapter 11 case on the Debtor and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate effectively in chapter 11 as a debtor-in-possession

26. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

Dated: February 15, 2011

OCEAN PLACE DEVELOPMENT, LLC.

By: William R. Dixon, Jr.
Vice-President, TLC New Jersey Corp.
Manager of Ocean Place Development LLC

# **EXHIBIT A**

## ORGANIZATIONAL CHART



01/16/2008

# **EXHIBIT B**

