RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Joseph L. Schwartz, Esq. (JS-5525)
Kevin J. Larner, Esq. (KL-8627)
Headquarters Plaza, One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for AFP 104 Corp.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>OCEAN PLACE DEVELOPMENT LLC,<br>                                                            Debtor. | Chapter 11<br>Case No. 11-14295 (MBK) |

**OBJECTION OF AFP 104 CORP. TO DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, GRANT SECURITY INTERESTS AND LIENS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361 AND 364(c) AND (B) <u>MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)</u>**

AFP 104 Corp. ("AFP"), by and through its undersigned counsel, hereby submits the within Objection (the "Objection") to the Emergency Motion of the Debtor, Ocean Place Development LLC (the "Debtor"), for entry of an Order (A) Authorizing the Debtor to Obtain Postpetition Financing, Grant Security Interests and Liens and Accord Priority Status Pursuant to 11 U.S.C. §§ 361 and 364(c) and (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362(d) (the "Motion"). In support of the Objection, AFP respectfully states as follows:

**PRELIMINARY STATEMENT**

AFP acknowledges and understands that Chapter 11 debtors often need post-petition financing while attempting to reorganize. Post-petition financing, however, can only be approved provided the debtor complies with the requirements mandated by the Bankruptcy Code. Here, the Debtor seeks to obtain post-petition financing ("DIP financing") from an entity

called OPN Acquisitions LLC (the "DIP Lender") in exchange for, among other things, the granting of liens and security interests that the Debtor represents "shall be subordinate to such security interest[s] of AFP." (See Motion at ¶ 15). However, contrary to the Debtor's representations in the Motion, a cursory review of the Motion and the DIP Agreement (Docket No. 93) (defined herein) reveals that the proposed DIP financing is, in reality, a disguised priming lien loan. This is because the Debtor seeks authority to repay the DIP Lender from AFP's collateral, in full, prior to repaying AFP's first priority secured claim. If the DIP Lender truly agrees to make a DIP loan on a junior lien basis, it should not get repaid ahead of AFP.

Not only does the Debtor improperly seek to prime AFP's liens, but through the Motion, the Debtor also improperly seeks to sell a fifty percent (50%) stake in itself to the DIP Lender, in violation of 11 U.S.C. § 363 and outside of the plan process, without any necessary disclosures, in exchange for a short term bridge loan that the Debtor proposes to repay in short order.[1]

Finally, despite the Debtor's contentions in the Motion that it has been unable to obtain financing on less onerous terms than the DIP Facility, given the unreasonable terms currently demanded by the DIP Lender, AFP, through a designee, is ready and willing to provide the Debtor with post-petition financing in the amount of $1.5 million on terms significantly more favorable than those contained in the DIP Agreement and in the Motion.

For these reasons, and the additional reasons set forth herein, AFP respectfully requests that the Court deny the Motion.

---

[1] Tellingly, the name of the DIP Lender is OPN *Acquisitions* LLC, which reflects that this proposed financing is not truly debtor-in-possession financing but instead is a disguised sale by the Debtor and transfer of control to a third party outside of the plan process and in violation of the Bankruptcy Code.

2

## BACKGROUND

**A.     The Debtor's Bankruptcy Filing.**

1. On February 15, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. Since the Petition Date, the Debtor has continued to operate its business and manage its affairs as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in this chapter 11 case.

3. The Debtor owns and operates the Ocean Place Resort & Spa, which includes a 254-room hotel and resort located on approximately 17 acres in Long Branch, New Jersey (collectively, the "Hotel").

**B.     The Debtor's Indebtedness to AFP.**

4. As of the Petition Date, the Debtor owed AFP $57,245,372.26, plus attorneys' fees and costs, which claim is secured by a first priority lien on all the Debtor's assets, including the Hotel.

5. The Debtor's obligations to AFP arise from certain loans (the "Loan") made to the Debtor by AFP's predecessor in interest, Barclays Capital Real Estate, Inc. ("Barclays"), which Loan was memorialized by a loan agreement dated as of April 25, 2006, as amended on December 27, 2006, between the Debtor, as borrower, and Barclays, as lender (the "Loan Agreement").

6. To memorialize its obligations under the Loan Agreement, the Debtor executed two (2) separate promissory notes in favor of Barclays, in the original principal amounts of $44,000,000 and $8,875,000 (collectively, the "Notes").

7. To secure repayment of all amounts due under the Notes, the Debtor granted Barclays a first priority mortgage and first priority liens on all the Debtor's assets, as reflected in a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 3, 2007, and effective as of April 25, 2006 ("Mortgage 1"); a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of March 30, 2007 ("Mortgage 2"); and a First Amendment to Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of March 2007 ("Mortgage 3," and, collectively with Mortgage 1 and Mortgage 2, the "Mortgages").

8. Barclays properly perfected its liens and security interests by filing and recording the appropriate documents with the appropriate government authorities.

C.  **The Foreclosure Judgment.**

9. The Loan matured on January 9, 2008, which the Debtor failed to repay, causing a default by the Debtor under the relevant Loan documents.

10. As a result of the Debtor's default, on or about October 3, 2008, Barclays commenced a foreclosure action against the Debtor's Hotel in the Superior Court of New Jersey (the "State Court"), which ultimately resulted in the State Court's entry of judgment on or about August 12, 2010 in favor of Barclays in the amount of $53,205,117.94, plus interest (the "Foreclosure Judgment").[2]

11. Shortly after entry of the Foreclosure Judgment, on or about October 26, 2010, AFP purchased from Barclays and took by way of assignment all of Barclays' rights and

---

[2] In the Motion, the Debtor indicates that it may have the ability to challenge the validity of AFP's liens. (See, e.g., Motion at 16(vii)). However, as a result of the Foreclosure Judgment, AFP's first priority lien has been conclusively established. Both under the doctrines of res judicata and the Rooker-Feldman doctrine, the State Court findings on these issues cannot be challenged by the Debtor herein. See, e.g. Patetta v. Wells Fargo Bank, Civ. Action No. 09-2848, 2010 WL 1931256 (D.N.J. May 13, 2010) (an entry of a foreclosure judgment is sufficient to invoke Rooker-Feldman doctrine).

interests under the Loan Agreement, Notes and Mortgages (collectively, the "Loan Documents").

12. Thereafter, the Monmouth County Sheriff scheduled a foreclosure sale of the Hotel for January 24, 2011. After the Debtor delayed by exercising its two statutory adjournments of the foreclosure sale, causing the foreclosure sale to be adjourned to February 22, 2011, the Debtor filed its Chapter 11 bankruptcy petition, again for purpose of delay.

**D.    Cash Collateral.**

13. Over AFP's objection, on March 11, 2011, the Court entered a Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection (the "Cash Collateral Order").

14. The Cash Collateral Order provides, *inter alia*, that the Debtor may continue to operate its business and pay various expenses from AFP's cash collateral, in accordance with the budget annexed to the Cash Collateral Order (the "Cash Collateral Budget"). As adequate protection for the Debtor's use of AFP's cash collateral, the Court required the Debtor make monthly adequate protection payments to AFP, granted AFP replacement liens on all the Debtor's post-petition assets and granted AFP a super-priority administrative claim against the Debtor's estate.

**E.    The Motion.**

15. Through the Motion, the Debtor now seeks Court approval of a $1.5 million debtor-in-possession loan ("DIP loan") from the DIP Lender to enable the Debtor to bridge working capital shortfalls over the next few months, pursuant to proposed Loan and Security

Agreement (the "DIP Agreement").[3]  (See Docket No. 93).  The proposed DIP loan will have a term of six (6) months, but can be repaid in full at any time, and proposes to pay the DIP Lender interest at a rate of twelve percent (12%) per annum.

16.     In the Motion, the Debtor represents that it seeks approval of the DIP loan on a junior lien basis under 11 U.S.C. §§ 364(c)(2) and (c)(3).  However, notwithstanding the Debtor's representations in the Motion, in reality, the Debtor seeks to provide the DIP Lender with a priming lien having priority over AFP's first priority liens against the Hotel and the Debtor's personalty, and seeks to repay the DIP Lender in full over a very short time period prior to repaying AFP the more than $57 million that the Debtor owes to AFP.

17.     Further, in exchange for the DIP Loan, the Debtor also seeks authority to sell a fifty percent (50%) stake in the Debtor to the DIP Lender and provide the DIP Lender with substantial control over the Debtor's business and this Chapter 11 case, outside of the plan process, without necessary disclosures, and in violation of 11 U.S.C. § 363.

18.     For the reasons set forth below, the Court should not approve the Motion and should not permit the Debtor to ignore the Bankruptcy Code and allow the DIP Lender to hijack the Debtor's business and this bankruptcy case.

**OBJECTION**

**A.     The DIP Facility in Reality Seeks to Approve DIP Financing on a Priming Lien Basis.**

19.     Despite the Debtor's representations that it only seeks to grant the DIP Lender liens on unencumbered assets (of which there are none) and junior liens on encumbered assets, wherein the Debtor asserts that "the interests of AFP are not affected by the DIP Facility,"

---

[3] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Agreement.

6

(Motion, ¶ 24), in reality, the Motion proposes to prime AFP's liens by having the DIP Lender repaid on account of its DIP loan ahead of AFP. This type of loan proposed by the Debtor cannot be approved pursuant to 11 U.S.C. § 364(c) as a matter of law.

20. It is axiomatic that a junior secured creditor cannot receive a distribution on account of its lien until the senior secured creditor is paid in full from the proceeds of the collateral. To do otherwise would place that junior secured creditor in a senior lien position. See In re Chevy Devco, 78 B.R. 585, 590 (Bankr. C.D. Cal. 1987) ("The limitation that benefits cannot flow from the senior to junior parties except by consent of the senior is very clear. In this case the secured creditor is being made to subordinate so that those with lower priority can potentially make a profit. This is not to be allowed.")

21. It is also axiomatic that a motion for approval of post-petition financing pursuant to 11 U.S.C. § 364(c)(3) cannot be granted when the proposed lending would prime a secured creditor's valid liens without providing the senior lienholder with adequate protection under 11 U.S.C. § 364(d)(1). In re Barbara K. Enters, 2008 Bankr. LEXIS 1917 (Bankr. S.D.N.Y. 2008); cf. In re Colad Group, Inc., 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005) ("Generally, however, the Bankruptcy Code gives to post-petition secured creditors only the same rights that a secured creditor could acquire outside bankruptcy. . . . The debtor and its secured creditor do not constitute a legislature. Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties.").

22. Although the Debtor nominally represents that it seeks authority under 11 U.S.C. § 364(c)(3), and claims that it will only be providing the DIP Lender with junior liens on the assets encumbered by AFP's senior liens, the Debtor's proposed treatment of the DIP Lender makes it clear that the proposed liens to be granted will be priming, not subordinated, liens.

First, the Debtor proposes to fully repay the DIP Lender on the Maturity Date or earlier, which will be prior to the Debtor's repayment of AFP's claims. (See DIP Agreement, § 2.1(g)). Additionally, the proposed order submitted with the Motion seeks to grant the DIP Lender relief from the automatic stay to, *inter alia*, permit the DIP Lender to "receive collections of Collateral for application to the DIP Facility" and "to enforce the DIP Liens and the obligations due under the DIP Loan Documentation," without regard for AFP's prior lien rights. (See proposed order ¶ 9). In fact, the DIP Agreement provides the DIP Lender with the unqualified right to take possession of and dispose of the Collateral upon a default by the Debtor, without regard to the senior rights of AFP. (See DIP Agreement, §§ 8.2(c)-(k)).[4]

23.     As the Court is aware, the Debtor cannot demonstrate that there is sufficient value in the Collateral to provide adequate protection with respect to AFP's secured claim.[5] Consequently, every dollar paid to the DIP Lender to repay the DIP loan would necessarily reduce AFP's interest in its collateral, without providing AFP with any adequate protection for that diminution in value. 11 U.S.C. § 364(c) does not permit this result as a matter of law.

24.     For these reasons, the Debtor should not be allowed to ignore 11 U.S.C. § 364(d) and misrepresent that it is only granting liens to the DIP Lender on a junior lien basis.

---

[4] The priming nature of the lien being provided to the DIP Lender is further amplified by the fact that the DIP Agreement gives the DIP Lender the unqualified right to, among other things, enter the Debtor's places of business, remove collateral and books and records, and endorse the Debtor's name on the Debtor's checks to make payments to the DIP Lender, in total disregard of AFP's rights and the cash management arrangements in place between the Debtor and AFP, as ordered by this Court. (See DIP Agreement at §§ 8.2(f), (j)).

[5] The question of adequate protection of AFP's interests was explored in earlier hearings before this Court, when the Debtor unsuccessfully attempted to establish that an equity cushion exists. In rendering its decision, the Court explicitly rejected the Debtor's arguments with respect to an equity cushion. See 3/10/11 Hrg. Tr. at 22:19-20 ("So in all, I do not find that there is an equity cushion.")

B. **The Motion Provides for a Disguised Sale of a 50% Stake in the Debtor and Cannot be Approved.**

25. Notwithstanding the fact that the Debtor is only seeking $1.5 million in post-petition financing from the DIP Lender, which the Debtor proposes to repay with twelve percent (12%) interest per annum over the next few months, the Debtor nonetheless also seeks authority to sell a fifty percent (50%) stake in itself to the DIP Lender as part of the so-called loan transaction, and further seeks to provide the DIP Lender with virtually complete control over the Debtor's business and this Chapter 11 case.[6] In fact, this proposed sale of a 50% stake in the Debtor is a condition precedent to the closing of the DIP Facility. (See DIP Agreement, § 4.2(c)). AFP submits that this type of transaction can only be approved by the Court upon a motion under 11 U.S.C. § 363 or pursuant to a plan, but not as part of a post-petition financing arrangement under 11 U.S.C. § 364.

26. Importantly, bankruptcy courts consistently hold that financing arrangements amounting to a sale of a debtor's assets outside of plan of reorganization that evade confirmation requirements should not be approved under the guise of 11 U.S.C. § 364. See, e.g., In re Belk Props., LLC, 421 B.R. 221, 225 (Bankr. N.D. Miss. 2009) (where debtor-in-possession and its proposed postpetition lender sought approval of postpetition financing pursuant to 11 U.S.C. §§ 364(c) and (d), modification was required to preclude postpetition lender from gaining control of debtor's assets without going through processes of 11 U.S.C. § 363(b) sale.); Resolution Trust Co. v. Official Unsecured Creditors Committee (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (9th Cir. BAP 1992); In re Chevy Devco, 78 B.R. 585, 589-90 (Bankr. C.D. Cal. 1987); see also In re Ames Department Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that

---

[6] The Motion and the Term Sheet indicate that the proposed "sale" is in return for the DIP Lender's commitment to provide the Debtor with future post-petition financing. (See Motion, ¶ 16(x)(d); Term Sheet, p. 2-3). Strikingly absent from the Motion are any details of this future "commitment."

"the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); In re Mid-State Raceway, Inc., 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).

27.     Strict adherence to the Bankruptcy Code is especially warranted where, as here, the Debtor is seeking to effectuate a sale yet has failed to disclose any information regarding the identity of the DIP Lender, its ability to fund the DIP Facility, or the identity of its members, who are not only seeking to finance the Debtor, but are seeking to purchase a fifty percent (50%) stake in the Debtor.  Cf. Galleria Inv., LLC v. Hong Duck, LLC (In re Galleria Inv., LLC), Case No. A06-62557, 2008 Bankr. LEXIS 1860, at *22 (Bankr. N.D. Ga. Apr. 4, 2008) (emphasizing importance of disclosing information about a potential purchaser to ensure that it has "financial ability to close the transaction"); In re Tamarack Resort, LLC, 2010 Bankr. LEXIS 3680 at *40 (Bankr. D. Idaho Oct. 19, 2010) (denying post-petition financing motion and noting that the lack of information disclosed regarding the proposed lender and its relationship to other parties in the case was extremely problematic).

28.     Here, the lack of information about the DIP Lender is especially curious, given the Debtor's counsel's statements at the outset of this case that the Debtor would seek post-petition financing from its principals, not from a third-party financier:

> And if we cannot make peace with our secured lender, we will need DIP financing.  And, even if we do make peace with them, we might need DIP financing.  And, the principals of the debtor are prepared to put that in.  They're working on it as we speak. . . .  So, to the extent there is a cash shortfall, you know, the debtor's principals have expressed to us, and they're set forth in our papers, that they are prepared to make a DIP loan, on an emergent basis, if needed.  And, you know, on the longer term basis, certainly, once we get past the motion to dismiss, which we expect we will.

10

(2/17/11 Hrg. Tr. 26:2-7, 12-17).

29. Further, not only is the proposed sale a condition precedent to the closing of the DIP Facility, but the Motion and the DIP Facility contain additional inappropriate provisions giving significant control over the Debtor to the DIP Lender. (See Term Sheet, at 3-4). "While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender." In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008).

30. Importantly, a lender cannot be cloaked "with the rights of a debtor-in-possession as contemplated by § 1107 without having been duly appointed through the procedures of § 1104(a)." In re Belk Props., LLC, 421 B.R. 221, 226 (Bankr. N.D. Miss. 2009).

31. Here, the Debtor essentially seeks to ignore its fiduciary duties as a debtor-in-possession and transfer those duties to the DIP Lender through a disguised sale of a fifty percent (50%) stake in the Debtor. (See, e.g., §§ 8.2(d), (f) and (j) of DIP Agreement) (providing the DIP Lender with ability to collect, sell, lease or assign collateral, take possession of the books and records of the Debtor and endorse checks on the Debtor's behalf, notwithstanding the Debtor's fiduciary duties as a debtor in possession, AFP's senior lien rights and the provisions of the Court's Cash Collateral Order).

32. For these additional reasons, AFP submits that the Court should not approve the Motion.

C. **The Proposed DIP Financing is not in the Best Interests of the Estate.**

33. The Bankruptcy Code requires a debtor to establish that a proposed post-petition financing arrangement is in the best interests of the debtor and its estate:

11

> In order to secure approval of post-petition financing pursuant to 11 USCS § 364(c) or (d), a debtor-in-possession bears the burden of proving (1) that proposed financing is exercise of sound and reasonable business judgment, (2) that no alternative financing is available on any other basis, (3) that financing is in best interests of estate and its creditors, and (4) as corollary to first three points, that no better offers, bids, or timely proposals are before bankruptcy court.

In re Phase-I Molecular Toxicology, Inc., 285 B.R. 494, 495 (Bankr. D. N.M. 2002).

34.  Here, for the reasons noted, the Debtor cannot establish these elements.

35.  Additionally, given the patently unreasonable terms proposed here by the DIP Lender, AFP, through a designee, is ready and willing to provide the Debtor with DIP financing on terms much more reasonable and favorable to the estate than those proposed by the DIP Lender. In particular, this third party lender stands ready and willing to provide the Debtor with a $1.5 million DIP loan on terms similar to those set forth in the Term Sheet attached to the Motion and the DIP Agreement, with the following modifications, which makes AFP's designee's proposed DIP loan more beneficial to the Debtor's estate than the DIP loan proposed by the DIP Lender:

- The loan would not require any secured financing. The loan would be made on an unsecured basis, pursuant to 11 U.S.C. § 364(c)(1), providing the third party lender with a superpriority administrative claim;

- The loan would carry an annual interest rate of 6.0%, with no fees, points or other closing costs;

- AFP's designee would waive Covenant No. 9 on the Term Sheet attached to the Motion, thereby not requiring the Debtor to engage in good-faith negotiations with the City of Long Branch;

- AFP's designee would waive Covenant No. 10 on the Term Sheet, thereby benefiting the Debtor's estate by removing the obligation for the Debtor to indemnify William R. Dixon, Jr. and Tiburon Capital LLC for their potential personal liability to AFP; and

- AFP's designee would waive Condition Precedent No. 7 on the Term Sheet, thereby making this Court's determinations regarding AFP's stay relief motion irrelevant to the commencing of the lending.

36. In order to approve post-petition financing under 11 U.S.C. § 364(c), the Court must find that the debtor cannot obtain funding on a less onerous basis. See In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

37. Given the fact that AFP's designee is willing to provide DIP financing on better terms, AFP submits that the Court cannot approve the Motion.

## D. Other Objections.

38. Additionally, the following provisions in the Motion, the DIP Agreement and/or the proposed form of order are objectionable and should not be approved by the Court in their current form:

- Section 3.1(b) of the DIP Agreement and the Term Sheet attached to the Motion improperly propose to grant the DIP Lender liens on avoidance actions.

- Section 4 of the DIP Agreement proposes to require the Debtor to pay all of the fees and expenses associated with closing the DIP loan, which are not disclosed, and which would be paid from AFP's collateral, in violation of the Cash Collateral Budget.

- Section 5.4 of the DIP Agreement includes a false representation that there are no outstanding judgments against the Debtor.

- Section 6.4 of the DIP Agreement requires the Debtor to name the DIP Lender as a loss payee and/or as an additional insured, without regard to AFP's first priority lien position, or to obtain additional insurance, which could negatively affect AFP.

- Section 6.8 of the DIP Agreement requires the Debtor to pay certain expenses, including legal fees incurred by DIP Lender, related to the DIP Facility. These payments are inappropriate, as they would necessarily be made from AFP's cash collateral, and are not in accordance with, or provided for, in the Cash Collateral Budget.

- Section 6.11 of the DIP Agreement permits the DIP Lender to inspect the collateral at the Debtor's expense. Any such payments are also inappropriate, as they would necessarily be made from AFP's cash collateral, and are not in accordance with, or provided for, in the Cash Collateral Budget.

- Section 6.13 of the DIP Agreement requires the Debtor to pay the DIP Lender such amounts as the DIP Lender, in its sole discretion, shall determine represents loss,

13

damage or material diminution in value of collateral, which payments would be made from AFP's collateral, and in violation of the Cash Collateral Budget.

- The DIP Agreement provides for the creation of a "Budget" of projected cash receipts and disbursements, and provides that such "Budget" "shall be in form and substance satisfactory to the DIP Lender, in its sole discretion." (DIP Agreement, § 6.15). No such "Budget" is attached to the Motion. To the extent the "Budget" discussed in the DIP Agreement proposes to use AFP's cash collateral -- which it necessarily will – the DIP Lender's "sole discretion" is irrelevant, and the Debtor can only make disbursements in accordance with the Court's Cash Collateral Order.

- The DIP Agreement prohibits the Debtor from making any payments on account of its pre-petition debt. (DIP Agreement, § 6.18). Pursuant to the Court's Cash Collateral Order, the Debtor is required to make adequate protection payments to AFP on account of AFP's claim against the Debtor.

- Section 6.14 of the DIP Agreement requires the Debtor to obtain comments from the DIP Lender prior to filing pleadings with the Court, thereby allowing the DIP Lender to have improper control. The DIP Agreement further improperly provides the DIP Lender with substantial control pursuant to various provisions.

- Section 8.2 of the DIP Agreement authorizes the DIP Lender to take various actions upon a default. Section 8.2 must be explicitly made subject to the rights of AFP as the senior lienholder and must be amended to provide that any action permitted under Section 8.2 of the DIP Agreement can only be taken by the DIP Lender upon receipt by the DIP Lender of AFP's written authority to take such action.

- Sections 8.2(f) and 8.2(j) must be removed from the DIP Agreement. These provisions permits the DIP Lender to take possession of the books and records of the Debtor and endorse checks on the Debtor's behalf, notwithstanding the Debtor's fiduciary duties as a debtor in possession, AFP's senior lien rights and the provisions of the Court's Cash Collateral Order.

39. Additionally, the following documents are necessary for parties and the Court to fully comprehend the DIP loan, but have not been provided to AFP or the Court:

- The Note and Mortgage, referenced in Section 4.1 of the DIP Agreement.

- The 4th Amendment to the Debtor's Operating Agreement, referenced in Section 4.2(d) of the DIP Agreement.

40. Until parties and the Court are given sufficient time to review these documents and present objections to the provisions contained therein, AFP submits that the Court should not approve the Motion.

41. The DIP Loan also requires the Debtor to reconfirm its obligations to indemnify William R. Dixon, Jr. and Tiburon Capital LLC in respect of any payments made by them to AFP under their guaranties. (See Motion at ¶ 16 (xiii)(j). This is not in the best interests of the estate.

42. Finally, the Motion does not comply with this Court's General Order Adopting Guidelines for Financing Requests, dated November 25, 2009 (the "General Order"), in that it does not prominently disclose and justify certain extraordinary provisions contained in the Motion, including, but not limited to: (i) the DIP Facility provides for the DIP Lender to obtain a lien upon Avoidance Actions (see Motion, at ¶ 16(vii); DIP Agreement at section 3.1(b)) and (ii) the DIP Facility prohibits the Debtor from incurring any additional debt or providing any further liens upon the Collateral (see DIP Agreement, § 6.5).

43. For these additionally reasons, AFP submits that the Court should not approve the Motion.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, AFP respectfully requests that the Court deny the Motion, and grant AFP such other and further relief as the Court deems just and equitable.

                          RIKER DANZIG SCHERER HYLAND
                          & PERRETTI LLP

                          By:    /s/ Joseph L. Schwartz
                                 Joseph L. Schwartz (JS-5525)

                          Counsel to AFP 104 Corp.

Dated: March 21, 2011
4120543.2