**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X
                                                        CHAPTER 11

In Re:

OCEAN PLACE DEVELOPMENT, LLC.,         Case No.: 11-14295 (MBK)

                                  Debtor.
--------------------------------------------------------X

Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Wojciech F. Jung, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Attorneys for Debtor, Ocean Place Development, LLC

Joseph A. Boyle
Kelley Drye & Warren LLP
200 Kimball Drive
Parsippany, New Jersey 07054
Attorneys for Creditor AFP 104 Corp.

**MICHAEL B. KAPLAN, U.S.B.J.**

**OPINION**

**I.    INTRODUCTION**

       This matter comes before the Court by way of a Motion filed by Debtor, Ocean Place Development, LLC ("Debtor" and/or "Ocean Place") for a final order approving the use of cash collateral. AFP 104 Corp. ("AFP" and/or "Lender"), the secured lender, objects to Debtor's Motion and additionally requests that this Court dismiss the Debtor's bankruptcy case for cause, including bad faith, or, alternatively, vacate the automatic stay. AFP contends that the Debtor's

Chapter 11 filing was in bad faith because (1) the Debtor will be unable to successfully reorganize and; (2) AFP lacks adequate protection if the case proceeds. Central to this argument is AFP's belief that the "hotel revenues" (for purposes of this opinion, this term encompasses revenues generated from room occupancy, food and beverage sales, catering, gift shop purchases, and spa and related hotel services) which the Debtor generates are not part of the Debtor's estate because they were unconditionally and absolutely assigned to AFP's predecessor in interest prior to the bankruptcy filing. As such, the principal issue the Court seeks to address in this opinion is whether the Third Circuit's decision in In re Jason Realty, L.P., 59 F.3d 423 (3d Cir. 1995), which held that an assignor's interests in rents under a lease were not property of the assignor's estate, precludes the Debtor from using these revenue proceeds as part of its reorganization efforts.

For the reasons set forth below, the Court finds that Jason Realty is inapplicable in this case because the hotel revenues at issue are not "rents" within the meaning of Jason Realty. Specifically, the Court differentiates between a lessee or tenant and a hotel guest licensee, who holds only a personal contract with respect to the property as opposed to an ongoing interest in the property. As a result, the Court finds that the hotel revenues are properly classified as personal property – not an interest in realty – that falls within the ambit of estate property and subject to the Article 9 provisions of the Uniform Commercial Code. 11 U.S.C. § 541(a). Accordingly, the hotel revenues are available for the Debtor's use as cash collateral in this proceeding.

II.   PROCEDURAL HISTORY/FACTS

On February 15, 2011, Ocean Place, a beachfront resort property in Long Branch, New Jersey, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States

2

Code. The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. The Ocean Place resort is sited on 17-acres featuring 1,000 feet of ocean frontage and is improved with a 254-room hotel that includes 40,000 square feet of meeting space, three restaurants, a bar/lounge, a full-service spa, and numerous resort amenities. The Debtor employs between 95 and 340 employees, depending upon the season, through the property management entity West Paces Hotel Group, LLC ("West Paces").[1]

As of the petition date, the Debtor owed approximately $57,245,372.26 to AFP pursuant to a Loan Agreement dated April 25, 2006, as amended from time to time, entered into by and between the Debtor as borrower and Barclays Capital Real Estate Inc. as lender. That amount includes a per diem interest charge of $14,531 per day and also is subject to an attorney's fees award of approximately $95,000. Borrowings under the Loan Agreement are evidenced by two promissory notes in the amounts of $8,875,000 and $44,000,000 and are secured by a variety of instruments including a Mortgage, Assignment of Rents and Leases, Security Agreement, as well as UCC and fixture filings, executed together with the Loan Agreement (Collectively "Loan Documents"). The Loan Documents include a broad definition for the term "rents," both in the Mortgage and in the Assignment of Rents and Leases. The definition provides that "rents" is to include:

> … all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreation facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manger of the hotel or the commercial space located in the Improvements or acquired from others . . . , license, lease, sublease and concession fees

---

[1] The Court notes that on March 25, 2011, the Court entered an Order authorizing the Debtor's entry into a management agreement with Coakley and Williams ("C & W") hotel management company. C & W replaced West Paces.

3

and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machines sales and process, if any . . .whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

In connection with the Loan Agreement and the Security Instrument, the Debtor entered into a Lockbox – Deposit Account Control Agreement with Barclays, the Bank of New York and West Paces. Among other things, the Lockbox Agreement requires that deposits of all rents and income generated from the Debtor's property be placed into a designated depository account at the Bank of New York for the benefit of the Lender. The Lockbox Agreement also established a lockbox for the collection and processing of the remittances for eventual deposit into the designated depository account at the Bank of New York.

The borrowing under the Loan Documents matured on January 9, 2008. From their inception and up to the January 9, 2008 maturity date, the Debtor was current in its obligations to Barclays. For approximately two years from the maturity date through January of 2010, the Debtor paid Barclays interest at the default rate of interest of approximately 9.8%. In January of 2010, the Debtor defaulted on the loan. On or about October 26, 2010, AFP purchased from Barclays all of Barclays' rights under the Loan Documents. Following the purchase of Barclays' interest in the Debtor, AFP obtained a foreclosure judgment and scheduled a foreclosure sale of the Debtor's assets for February 22, 2011. One week prior to the scheduled foreclosure sale, the Debtor filed this Chapter 11 case, after receiving two statutory adjournments.

On February 17, 2011, among other First Day matters, the Court held a hearing on the Debtor's Motion for an Order of the Bankruptcy Court Authorizing the Use of Cash Collateral. That same day, the Court entered an Interim Order Authorizing the Use of Cash Collateral.

On March 9, 2011, the Court conducted an evidentiary hearing with respect to the Final Cash Collateral Motion and the Motion to Dismiss the Debtor's bankruptcy case filed on behalf

4

of AFP. The Court heard testimony on behalf of the Debtor by William R. Dixon, Jr., the vice president of the Debtor's Manager, and Gary Williams, a principal of Coakley & Williams, the putative new property manager of the Debtor. The Court also heard the testimony, on behalf of AFP, of Anthony Miceli, the Chief Financial Officer of United Capital Corporation, of which AFP is an indirect subsidiary. Mr. Miceli is also the president of AFP. In addition to each witness's testimony, the Court also accepted into evidence the declarations of Mr. Dixon, Mr. Williams and Mr. Miceli.

On March 10, 2011, the Court denied AFP's Cross Motions for dismissal or stay relief, and granted the Debtor's Motion for a final order approving the use of cash collateral. The Court recited its decision regarding these motions into the record. On that date, the Court also reserved the right to prepare and file a more expansive written opinion on certain issues. The Court now exercises that right with regard to its characterization of the hotel room revenues collected by Ocean Place and its analysis of the applicability of Jason Realty in the instant proceeding.

### III. JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984 referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A),(D),(G) & (M). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[2]

---

[2] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

IV. **DISCUSSION**

11 U.S.C. § 541 provides that "(a) The commencement of a case . . . creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case . . . . (6) proceeds, product, offspring, rents, or profits of or from property of the estate . . . ." The estate is to be broadly construed. In re St. Clair, 251 B.R. 660, 664 (D.N.J. 2000); See In re Village Green I, GP, 435 B.R. 525 (Bankr. W.D. Tenn. 2010).

Ocean Place requests authorization to use cash collateral pursuant to 11 U.S.C. § 363(c)(2) which provides:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
>
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

Id. "The ability to use cash collateral under § 363(c)(2) extends to the Debtor by virtue of 11 U.S.C. § 1107(a) which endows a Chapter 11 debtor in possession with 'virtually all of the rights and powers of a bankruptcy trustee . . .'" In re Village Green I, GP, 435 B.R. at 530 (citing United States v. Hunter (In re Walter), 45 F.3d 1023, 1027 (6th Cir. 1995).

The "cash collateral" which the Debtor seeks to use to reorganize is defined in 11 U.S.C. § 363(a) as:

> "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property and the fees, charges, accounts or *other payments for the use or occupancy of rooms and other public facilities in hotels, motels or other lodging properties subject to a security interest* . . . . whether existing before or after the commencement of a case under this title."

6

Id. (emphasis added). As such, property cannot be cash collateral unless it is also property of the estate. Jason Realty, 59 F.3d at 425-26 (determining that property that is not property of the estate as defined in 11 U.S.C. § 541(a) is "not available as cash collateral nor as a funding source for [a] debtor's reorganization plan.").

Accordingly, the Court's entry of a final order authorizing the use of cash collateral hinges, in large part, on whether the hotel room revenues are property of the estate which can be used by the Debtor for purposes of both operations and eventual reorganization. The courts in New Jersey have not yet addressed the issue of whether a security interest in hotel room revenues is either an interest in realty, or an interest in personalty that must be perfected and enforced pursuant to Article 9 of the New Jersey version of the Uniform Commercial Code.[3] Our task is thus to determine: (1) how the hotel room revenues collected by the Debtor should be characterized; and (2) even if deemed personalty, whether the Debtor's use of the hotel revenues in its reorganization efforts is inconsistent with the Third Circuit's holding in Jason Realty. Central to answering both questions is a discussion of the scope and applicability of Article 9 in the instant proceeding.

## SCOPE, APPLICABILITY, AND CHARACTERIZATION OF THE HOTEL ROOM REVENUES UNDER ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE

As noted in both Wachovia Bank Nat. Ass'n v. EnCap Golf Holdings, LLC, 690 F.Supp. 2d 311 (S.D.N.Y. 2010), and the Third Circuit in In Re Jersey Tractor Trailer Training Inc., 580 F.3d 147 (3d Cir. 2009), both New York and New Jersey have adopted revised Article 9 of the Uniform Commercial Code for secured transactions, see, e.g., N.J.S.A. 12A:9-101, *et seq.*; In re Chris-Don, Inc., 367 F.Supp.2d 696, 699 (D.N.J. 2005) ("The New Jersey legislature enacted revised Article 9 of the U.C.C. in 2001."). "[E]xcept as otherwise provided . . ., [Article 9]

---

[3] New Jersey's adoption of the UCC can be found in N.J.S.A. 12A:9-101, *et seq.*

applies to: (1) a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." U.C.C. § 9-109(a). It is palpably clear to the Court that the nature of the instant transaction reflects a secured transaction. Indeed, the Court notes that the Loan Documents grant AFP a security interest in the rents and leases. Specifically, Section 2.2 of the Assignments of Rent and Leases states that: "Borrower hereby grants to Lender, as security for the obligations, a security interest in the property to the fullest extent that the Property now or hereinafter may be subject to a security interest under the UCC. Borrower intends for the security instrument to be a 'security agreement' within the meaning of the UCC." Id. In addition, the Loan Documents provide other indicia of a secured transaction, namely, the Loan Documents: (1) permit the Debtor to collect rents as long as Debtor is not in default under the mortgage; (2) permit the Lender to use post-default rents only to apply to reduce the Debtor's obligation to the Lender; and (3) permit automatic termination of the Assignment of the repayment of the Debtor's obligation to the Lender. See Assignments of Rents and Leases, Section 2.05, Section 2.03 b(b), Lease Assignment Section 3.01.

However, the applicability of Article 9 is not without limit. Pertinently, Section 9-109(d)(11) provides that Article 9 does not extend to "the creation or transfer of any interest in or lien on real property, including a lease or rents thereunder." Id. Thus, were the hotel revenues properly classifiable as rents, the proceeds would fall outside the scope of Article 9. However, the Court finds that the Section 9-109(d)(11) exception does not apply to interests in hotel room revenues. In support, the Court adopts the cogent analysis found in Judge Howard C. Buschman, III's holding in In re Kearney Hotel Partners v. Richardson, 92 B.R. 95 (Bankr. S.D.N.Y. 1988). Judge Buschman explained:

> As in any case involving the construction of a statute, the starting point is the language of the statute itself." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 47

L.Ed.2d 668 (1976) quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed. 2d 539 (1975) (Powell J. concurring). The language of [§ 9 – 109 (d)(11)] clearly excludes only interests in real estate, including "a lease or rents thereunder," from the requirements of Article 9. By this, mortgages, leases and other instruments conveying an interest in real estate are excluded. Conversely, the language gives no indication that the income from the use of real estate . . . are excluded. Although the realty may be the subject of a mortgage, the creation of a security interest in such income is not the creation of an interest in realty. Rents are different. They are income from the creation of an interest in property. Thus the statutory language of [§ 9-109(d)(11)] indicates that only the creation or transfer of an interest in realty and the income from that interest in realty are excluded from Article 9. The Official Commentary offers no other interpretation. Security interests in income not attributable to the creation of an interest in realty are, therefore, governed by Article 9 generally. U.C.C. § 9-102(1).

Judge Buschman continued:

The significance of the plain meaning of the statutory language . . . lies in the general rule that "… guests in a hotel . . . are mere licensees and not tenants, and . . . they have only a personal contract and acquire no interest in the realty . . . ." In re Greater and Atlantic and Pacific Inv. Group., 88 B.R. 356, 359 (Bankr. N.D. Okla. 1988) (quoting from 49 Am.JUr.2d Landlord and Tenant 6 (1970)). See also DeWolf v. Ford, 193 N.Y. 397, 86 N.E. 527, 530 (1908) (A room in an inn is not, in a legal sense, the "dwelling house" of a guest, and the relation is not that of landlord and tenant, for notwithstanding the guest's occupancy, it is the house of the innkeeper) . . . It simply would distort the statutory language to hold that a guest in a hotel is a lessee and that the fee paid, although perhaps referred to in common parlance as 'rent,' is rent attributable to a lease.

Id. Instead, the Court finds that the hotel room revenues are "accounts" or "payments intangible" as defined by Article 9. See also In re Northview Corp., 130 B.R. 543 (9th Cir. BAP 1991) (characterizing hotel revenues as personal property characterized as an "account" or "payment intangibles" rather than rent).[4] The hotel occupants of Ocean Place are not "tenants" who possess an interest in real property, but merely licensees. Therefore, as a secured creditor,

---

[4] Section 9-102 defines "account," as "a right to payment of a monetary obligation, whether or not earned by performance (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of…" "Payment intangible" is defined as a "general intangible under which the account debtor's principal obligation is a monetary obligation." Id. The Court need not determine which definition is more apt. Klinger v. Pocono International Raceway, Inc., 289 Pa.Super. 484, 492, 433 A.2d 1357 (1981) ("Whatever specific code classifications of personal property describe the [hotel room revenues], the fact of their being personalty never change[s]. We need not be concerned to affix any specific label such as "inventory", "account receivable", "contract right" or "general intangible" to the [property].").

9

all the Debtor must do is establish that AFP's interests are adequately protected. The final cash collateral ordered entered on March, 11, 2011 has done that here.

Moreover, the Official Comments to the UCC, which clarify and relate the philosophy undergirding Article 9, further support the Court's construction. In particular, the Official Comment to Section 9-101 states:

> The growing complexity of financing transactions forces us to keep piling new statutory provisions on top of our inadequate and already sufficiently complicated nineteenth-century structure of security law . . . The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty. *Under this Article the traditional distinctions among security devices, based largely on form, are not retained; the Article applies to all transactions intended to create security interests in personal property and fixtures.*

Id. (emphasis added). Furthermore, with respect to the scope of Article 9, the Official Comment to Section 9-109 provides: "When a security interest is created, this Article applies regardless of the form of the transaction or the name that the parties have given to it." Id.[5] The Court is persuaded that the preceding commentary suggests that the UCC drafters intended that courts look beyond the labels given by the parties when determining whether the UCC, specifically Article 9, is applicable in any given proceeding. It is through this lens that the Court analyzes the hotel room revenues.

Towards this end, the Court does not find the expansive definition of "rents" provided in the Loan Documents dispositive. As aforementioned, the parties agreed to the following broad definition of rents in its Assignment of Rents and Leases:

---

[5] Additionally, while not dispositive, the Court finds further support in § 9-202: Title to Collateral Immaterial – "Except as otherwise provided with respect to consignments of sales of accounts, chattel paper, payment intangibles, or promissory notes, the provisions of this article with regard to rights and obligations apply whether title to collateral is in the secured party or the debtor." Id. Thus the manner in which the transaction itself is structured - as an assignment of title, for example - is not, in and of itself, outcome determinative.

> "Rents" include ". . . . . all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreation facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manger of the hotel or the commercial space located in the Improvements or acquired from others . . . , license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machines sales and process, if any . . .whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code."

See Boyle Decl., Ex.C and E, at p. 3. However, the Official Commentary makes clear that Article 9 encompasses all transactions in which a security interest has been created in personal property. Accordingly, the fact that the term "rents" was applied in the Loan Documents does not, in and of itself, remove the transaction from the protection of Article 9's umbrella. The Lender itself arguably believed and understood that its security interest in these revenues was governed by the UCC. Barclays' and AFP's UCC-1 filings reinforce this fact.[6] The nature of the transaction and the actions taken by and on behalf of the Lender persuade the Court that Article 9 undeniably governs here. In reaching this conclusion, the Court is likewise wary of lending support to a creditor's ability to draft itself outside of Article 9's integral protections for obligors and debtors, e.g., redemption rights (U.C.C. § 9-623) and collateral disposition requirements (U.C.C. § 9-610).

Finally, examination of New Jersey statutes further reveals that the New Jersey legislature continues to recognize a distinction between a guest in a hotel and a tenant under a

---

[6] Barclays' UCC filings seek an assertion of a security interest in the following: "All of Debtor's assets and personal property, including without limitation, all of Debtor's accounts, equipment, inventory, goods , accessions, software, general intangibles, payment intangibles, deposit accounts, instruments, money, chattel paper (whether electronic or tangible), investment property, letters of credit, letters of credit rights, supporting obligations, commercial tort claims, oil, gas and mineral rights (whether before extraction or extracted collateral), and all proceeds of the foregoing, (whether cash or non-cash proceeds, including insurance proceeds." AFP received an assignment of this UCC filing on or about November 3, 2010. See Boyle Decl., Exhibit C.

lease.[7] For example, the Truth-in-Renting Act, N.J.S.A. 46:8-43, *et seq.*, the purpose of which is to set forth the rights and responsibilities of residential tenants and landlords in New Jersey, specifically excludes from the application of the Act "dwelling units . . . in hotels, motels, or other guest houses serving transient or seasonal guests." N.J.S.A. 46:8-44 (defining "Landlord" under the Truth-in-Renting Act). See also N.J.S.A. 2A:18-59.2 which provides, in the context of an eviction, that the anti-eviction act "shall not apply to a hotel, motel or other guest house, or part thereof, rented to a transient guest or seasonal tenant . . . ." Id. Consistent with the aforementioned exclusions is New Jersey's judicial and legislative treatment of the rights of access and ensuing liabilities to which a landlord and hotel proprietor are respectively exposed. Johnson v. Kolibas, 75 N.J.Super. 56, 182 A.2d 157 (App.Div. 1962), certif. den. 38 N.J. 310, 184 A.2d 422 (1962), the leading New Jersey case discussing the distinction between a hotel guest and tenant, provides:

> The chief distinction between a tenant and a lodger or roomer lies in the character of their possession. The criterion is the right of exclusive possession. While the tenant has exclusive legal possession of the premises, the lodger only has the right to use the premises, subject to the landlord's retention of control and right to access of them.

Id. at 987 ("[N]ew Jersey case law clearly distinguishes the relationship between a guest and a tenant."). Chapter 29, "Hotels" embodies this distinction. N.J.S.A. 29:2-1(a) provides that "hotel" means any hotel . . . whose proprietor offers and accepts payment for rooms, sleeping accommodations or board and lodging and *retains the right of access to, and control of, the premises which are let.*" Id. (emphasis added). Lastly, relative to the obligations of a landlord, the liability of a hotel proprietor is limited. See N.J.S.A. 29:2-4 ("The proprietor of a hotel shall

---

[7] Interests in real property, including rents, are created and defined in accordance with the law of the situs of the real property. Jason Realty, 59 F.3d at 427 (citing Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); Commerce Bank v. Mountain View Village, Inc., 5 F.3d 34, 37 (3d Cir. 1993)).

be liable to any guest of the hotel *only* for ordinary and reasonable care in the custody of valuables or other personal property belonging to the guest."). Accordingly, the position of both the New Jersey legislature and the New Jersey courts bolsters this Court's finding that interests in hotel room revenues and interests in real property under a lease should not be accorded parallel treatment.[8]

In sum, notwithstanding the definition of "rents" provided in the Loan Documents, AFP has failed to present the Court with any source, case law or supplemental evidence to support its position that, in either New Jersey or New York, hotel revenues should be treated like leasehold interests. Instead, to treat the interests in an essentially identical manner, merely as a result of the parties' designation of the revenues as "rents," would stand in direct contravention of the panoply of New Jersey statutes dealing with "hotels," "landlords," and "tenants," the UCC Article 9 provisions, and the case law discussed above interpreting the relevant UCC provisions. As such, the Court finds that the hotel revenues are personal property in which AFP holds a perfected security interest and properly considered property of the Debtor's estate.

## <u>JASON REALTY</u> IS INAPPLICABLE WITH RESPECT TO INTERESTS IN PERSONAL PROPERTY

The Court now turns its attention to whether its finding that the interests in the Debtor's hotel room revenues are interests in personal property, and thus property of the estate available to the Debtor in its reorganization efforts, conflicts with the Third Circuit seminal case of <u>Jason Realty</u> and/or case law adopting the Third Circuit's holding in <u>Jason Realty</u>. <u>Jason Realty</u>

---

[8] The Court is cognizant that under a draft of the Uniform Assignment of Rents Act ("UARA"), adopted by the Uniform Law Commission in 2005, "rents" would include security interests in hotel room revenues. Unif. Assignment of Rents Act §§ 1-21, 7 (Pt. IB) U.L.A. 7 (2005) ("The [UARA] establishes that rents include any sum paid by a . . . licensee . . . for the right to possess or occupy the real property of another."). However, New Jersey (as with all but two states) has expressly declined to adopt the UARA. Unless and until it does so, the Court is constrained to follow existing New Jersey law, namely the provisions of New Jersey Uniform Commercial Code Article 9 and New Jersey property law, discussed throughout this opinion. Moreover, those jurisdictions to which we have cited for support – New York and Oklahoma – have not adopted the UARA.

addressed the rights of an assignee of a lease under a pre-petition assignment. 59 F.3d at 430. Specifically, the debtor in Jason Realty executed an assignment that provided: "for good and valuable consideration, receipt of which is hereby acknowledged, Jason Realty hereby grants, transfers, and assigns to the Assignee the entire of Lessor's interest in and to those certain leases . . . TOGETHER with all rents, income and profits arising from said leases." 59 F.3d at 426. The issue before the Third Circuit was "whether the assigned rents should have been classified as property of the estate." Id. AFP submits that even if the hotel revenues at issue are treated as personalty, the revenues were assigned absolutely and unconditionally to the lender prior to the bankruptcy and thus Jason Realty applies to restrict the Debtor's use.

Before discussing the Court's resolution of this issue, the Court pauses to provide a brief factual background. In the course of executing a promissory note, Jason Realty, the mortgagor and owner of a two-story retail and office building in Aberdeen, New Jersey, simultaneously executed a mortgage and an assignment of leases to the holder of the note, First Fidelity Bank, N.A. ("First Fidelity"). Jason Realty, 59 F.3d at 425-26. The terms of the assignment agreement, as referenced above, assigned the rents, income and profits from the property to First Fidelity, vested it with the title to the rents, and granted Jason Realty a license to collect the rents until the occurrence of an event of default. Id. Pursuant to the assignment, once Jason Realty defaulted, its license to collect the rents was automatically revoked. Id. Jason Realty defaulted on the note, and, First Fidelity, after filing an application for appointment of a receiver, began collecting rents from the tenants of the mortgaged property. Shortly thereafter, Jason Realty filed a voluntary Chapter 11 petition. Id. at 426.

The Third Circuit in Jason Realty examined the language of the assignment and concluded that, notwithstanding its role as part of a financing transaction and as additional

14

security for repayment of the note, the assignment was an absolute assignment that had transferred title to the assignee upon execution. Id. at 428-29. As such, the Debtor no longer retained an interest in the rents and the rents were not property of the estate. Id.; 11 U.S.C. § 541(a). To make that determination, the court first explained the relationship between federal Bankruptcy law and New Jersey property law. Specifically, the Court noted that "assignments of rents are interests in real property and, as such, are created and defined in accordance with the law of the situs of the real property." Id. at 427 (citing Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); Commerce Bank v. Mountain View Village, Inc., 5 F.3d 34, 37 (3d Cir. 1993)). "A federal court in bankruptcy is not allowed to upend the property law of the state in which it sits, for to do so would encourage forum shopping and allow a party to receive 'a windfall merely by reason of the happenstance of bankruptcy.'" Id. (citing Butner, 440 U.S. at 55, 99 S.Ct. at 918). Instead, bankruptcy courts must "afford . . . [creditors] the same protection [they] would have under state law if no bankruptcy had ensued." Id. Therefore, because "assignments of rent are interests in real property," the Court looked to New Jersey property law to classify the parties' interests in the rents. Id.

Looking to New Jersey law, Jason Realty explained that "it is settled in New Jersey that an assignment of rents passes title to the assignee." Id. (citing Paramount Bldg. & Loan Ass'n of City of Newark v. Sacks, 107 N.J.Eq. 328, 152 A. 457 (N.J. Ch. 1930). "An absolute assignment transfers title to the assignee upon its execution." Id. (citing New Jersey Nat'l Bank & Trust Co. v. Wolf, 108 N.J.Eq. 412, 155 A. 372 (N.J. Ch. 1931)). "An assignment is absolute if its language demonstrates an intent to transfer immediately the assignor's rights and title to the rents." Id. (citing In re Winsolw Center Assocs., 50 B.R. 679, 681-82 (Bankr.E.D.Pa. 1985)). The Court found that the assignment language was quintessentially absolute because the parties

15

mutually agreed, in words of the present, to transfer full title to the rents. Such an exchange "inescapably and unambiguously expressed an agreement to assign present title." Id. As such, the Jason Realty court concluded that the rents were assigned to First Fidelity and were not property of the bankruptcy estate. Id. at 428. Accordingly, the rents were not available as a funding source for the debtor's reorganization plan. Id.

However, the factual predicate in the instant proceeding is markedly distinct from Jason Realty. First, as the Debtor points out, the sole subject matter of Jason Realty was whether the debtor absolutely assigned its interest in rents, as defined by New Jersey's real property law, due from leases of its two-story retail and office building. The case did *not* involve the debtor's assignment of receipts from non-leasehold interests, such as receipts realized from the debtor's operation of a hotel, restaurant, or spa. In fact, AFP has failed to show that the Debtor is a party to any leases that generate substantial rents from leases of its real property. This is in direct contrast to the Jason Realty assignment clause assigning the "lessor's interest in and to those certain *leases*." Jason Realty, 59 F.3d at 427 (emphasis added).

More significantly, the Jason Realty court was assigned with an inapposite task. The Third Circuit was to determine whether the assignment of an undeniable interest in real property conveyed title to the lender or, instead, pledged the rents as security. 59 F.3d at 427. As such, the Jason Realty court's discussion was limited to the treatment of an assignment under New Jersey property law and the ensuing rights of an assignee arising under an absolute assignment of rents. On the contrary, this Court is tasked with determining whether hotel room revenues should be treated as interests in real property. Having determined that the interests in hotel room revenues should be characterized as "accounts" or "payment intangibles," as defined under Article 9, the Court need not address whether the assignment of rents absolutely vested title in

16

AFP.[9]  In so holding, the Court respectfully submits that the Third Circuit did not intend to include non-leasehold interests within the purview of its decision.  In support, the Court finds the following language telling: "It is important in interpreting New Jersey law that the otherwise worthy desire for achieving a reorganization under Chapter 11 should not trump *the rights of an assignee of a lease* under a pre-petition assignment."  Id. at 430.  Accordingly, the Court declines to extend Jason Realty to security interests in personal property.[10]

AFP further relies on In re Kingsport Ventures, L.P. d/b/a Kingsport Comfort Inn, 251 B.R. 841, 846-51 (Bankr. E.D. Tenn. 2000), a Tennessee District Court case that relied on Jason Realty, for the proposition that an assignment of rents is an absolute assignment of hotel revenues and not a pledge, thus divesting the debtor of any legal right to these revenues.  In Kingsport, the Chapter 11 debtor, a motel, transferred legal title in motel revenues to a mortgage lender pursuant to an assignment of rents.  The assignment granted the debtor a license to collect and use the revenues until its default under the terms of its obligations to the lender.  The Kingsport debtor defaulted prior to commencing its bankruptcy case.  Id. at 846.  In analyzing the assignment language, the Court found it was an absolute assignment that divested the debtor's interest upon default.  In so holding, the Kingsport court relied, in part, on the Third Circuit's holding in Jason Realty.  Id. at 849, n.8 (finding that "absolute assignments operate similarly in New Jersey").  However, the Court respectfully believes that the Kingsport court, without explanation or justification, expanded the Jason Realty holding beyond its intended reach.  It is true that absolute assignments may divest a debtor of any legal right to use rents, but

---

[9] In fact, this Court does not necessarily dispute that the transactions undertaken between Ocean Place and AFP reveal both a security agreement and an absolute assignment of rents.  However, the Court reinforces its position that as interests in personal property, the Court must determine the respective parties' interests as defined by and under the UCC, not according to New Jersey property law concerning title according to an assignment of rents.

[10] It is of no moment that Jason Realty did not explicitly address the UCC.  In fact, this omission is understandable because the rents collected from the commercial building clearly fall within the current § 9-109(d)(11) exception for "rents," which was § 9-104(j) under the version of the UCC in effect at the time of the Jason Realty decision.  Accordingly, the Court would have had no reason to discuss the UCC provisions.

it is also true that there is no Third Circuit case law or supplemental evidence to suggest that this holding extends beyond assignments of interests in *real property*. In fact, the Kingsport court makes no mention of the UCC whatsoever. As such, the Court respectfully disagrees with the Kingsport court's extension of the Jason Realty holding to interests in personal property, namely, receipts collected from hotel guest rooms. Moreover, this case is not about Tennessee law – as it was in Kingsport. Thus, Kingsport has no precedential weight before this Court.

In sum, the Court finds that Jason Realty, and the cases extending Jason Realty outside of the real property realm, are inapplicable in the instant proceeding because the revenues at issue are interests in personal property, not real property. To rule otherwise would countenance the ability of lenders to take security interests in personal property in a manner to evade the protections afforded to obligors under Article 9. This Court respectfully finds that the Jason Realty court did not intend such a result. To use the oft-quoted idiomatic Jason Realty language, the Lender confused "hotel revenue apples" with "leasehold proceed oranges."

V.  CONCLUSION

For the foregoing reasons, this Court finds that the hotel room revenues generated by the Debtor are not "rents" within the meaning of Jason Realty. As such, the revenues do not fall within the Section 9-109(d)(11) exception to Article 9 for "interest[s] in . . . real property, including a lease or rents thereunder." Instead, the hotel room revenues are personal property in which AFP maintains a valid security interest. Accordingly, the hotel revenues are available for use as cash collateral in the Debtor's reorganization efforts so long as AFP remains adequately protected. For the reasons expressed in the Court's oral decision, the Court deems AFP's collateral position to be adequately protected.

In sum, the Court denies AFP's Motion to dismiss and has carried AFP's motion to vacate the automatic stay until July 18, 2011 at which date the Court will assess what, if any, progress the Debtor has made toward successful reorganization. The Court grants the Debtor's Motion for a final order approving the use of cash collateral. An order reflecting this Court's ruling has already been entered.

/s/ Michael B. Kaplan
Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: March 31, 2011