**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| OCEAN PLACE DEVELOPMENT LLC, | ) Case No. 11-14295 (MBK) |
| | ) |
| Debtor. | ) |
| | ) |

### DISCLOSURE STATEMENT FOR THE
### DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO
### <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

---

<table>
<tr><td align="center"><b><u>IMPORTANT DATES</u></b></td></tr>
<tr><td>

- Date by which Ballots must be received by the Voting Agent: _____, 2011
- Date by which objections to the Plan must be filed and served: _____, 2011
- Hearing on Confirmation of the Plan: _____, 2011

</td></tr>
</table>

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Wojciech F. Jung, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Attorneys for the Debtor and Debtor in Possession*

## TABLE OF CONTENTS

Page

I.   EXECUTIVE SUMMARY ..................................................................................5

II.   IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ....................6

III.   THE DEBTOR'S STRUCTURE AND BUSINESS OVERVIEW ...........................10
   A.   OPD's Organizational Structure ..................................................10
   B.   Company Overview ....................................................................10
   C.   Revenues ..................................................................................12
   D.   OPD's Prepetition Capital Structure ............................................12
      (i)    Secured Loans ..................................................................12
      (ii)   Unsecured Loans ..............................................................14
      (iii)  Trade Claims ....................................................................14
      (iv)   Indemnity Obligations .......................................................14
      (v)    Membership Interests ........................................................15

IV.   SUMMARY OF LEGAL PROCEEDINGS ......................................................15
   A.   Pending Legal Proceedings outside the Bankruptcy Court ...............15

V.   EVENTS LEADING TO THE CHAPTER 11 FILING .......................................15
   A.   OPD's Debt Burden ...................................................................15
   B.   Prepetition Attempts To Refinance The Debtor's Loan Obligations ......15

VI.   THE COMMENCEMENT OF THE CHAPTER 11 CASE .................................16
   A.   First Day Relief .........................................................................16
   B.   Cash Collateral ..........................................................................16
   C.   Debtor-in-Possession Financing...................................................16
   D.   Capital contribution Agreement ...................................................17

VII.   RETENTION OF RESTRUCTURING AND OTHER PROFESSIONALS....................17

VIII.   DEVELOPMENTS DURING THE CASE ....................................................17
   A.   Motion(s) to Reject Certain Executory Contracts and Unexpired Leases......17
   B.   Entry Into Agreements ................................................................18
      (i)    Coakley & Williams .........................................................18
      (ii)   A-1 Contract Staffing .......................................................18
   C.   Settlement with West Paces .........................................................18
   D.   Exclusivity ................................................................................18
   E.   Claims Bar Date .........................................................................18

IX.     DESCRIPTION OF THE PLAN OF REORGANIZATION ...................................................19

        A.      Administrative Claims and Priority Tax Claims ..............................................19

        B.      Classification and Treatment of Claims and Interests...................................21

        C.      Acceptance Requirements ................................................................................23

        D.      Means for Implementation of the Plan ..........................................................24

        E.      Treatment of Executory Contracts and Unexpired Leases ............................26

        F.      Provisions Governing Distributions ...............................................................28

        G.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims ..........29

        H.      Settlement, Release, Injunction and Related Provisions ................................29

        I.      Conditions Precedent to Confirmation of the Plan and the Effective Date ..........31

        J.      Modification, Revocation or Withdrawal of the Plan .....................................31

        K.      Retention of Jurisdiction .................................................................................31

        L.      Miscellaneous Provisions.................................................................................31

X.      PROJECTED FINANCIAL INFORMATION.............................................................31

XI.     RISK FACTORS ...........................................................................................................32

        A.      Risks Relating to Bankruptcy.........................................................................33

                (i)      The Debtor may not be able to obtain confirmation of the Plan. .......................33

                (ii)     The Conditions Precedent to the Effective Date of the Plan may not occur. ..........33

                (iii)    Historical Financial Information of the Debtor may not be comparable to the Financial Information of the Reorganized Debtor. ..........33

                (iv)     The Debtor may object to the amount or classification of a Claim.....................34

        B.      Risks Related to Financial Information...........................................................34

XII.    SOLICITATION AND VOTING PROCEDURES ......................................................35

XIII.   CONFIRMATION OF THE PLAN...............................................................................36

        A.      The Confirmation Hearing ..............................................................................36

        B.      Deadline To Object To Confirmation ..............................................................36

        C.      Requirements For Confirmation Of The Plan ................................................36

        D.      Best Interests of Creditors/Liquidation Analysis ...........................................37

        E.      Feasibility..........................................................................................................38

        F.      Acceptance by Impaired Classes......................................................................38

        G.      Confirmation Without Acceptance by All Impaired Classes ..........................39

        H.      No Unfair Discrimination ................................................................................39

        I.      Fair and Equitable Test ...................................................................................39

                (i)      Secured Claims:.................................................................................39

                (ii)     Unsecured Claims:.............................................................................39

                (iii)    Equity Interests:................................................................................40

      J.      Valuation Of the Debtor..................................................................................................40

**XIV.    CERTAIN SECURITIES LAW MATTERS .....................................................................40**

      A.      Plan Securities................................................................................................................40

      B.      Issuance and Resale of Plan Securities Under the Plan................................................41

**XV.    RECOMMENDATION ......................................................................................................41**

## EXHIBITS

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Reorganized Debtor's Financial Projections

EXHIBIT C      Capital Investment Listing

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Capital Contribution Agreement

---

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY
SET FORTH HEREIN.

## I.    EXECUTIVE SUMMARY

Ocean Place Development, LLC ("**OPD**" or the "**Debtor**"), which owns and operates a resort property on the New Jersey shore, located at One Ocean Boulevard, Long Branch, New Jersey, submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims in connection with the solicitation of acceptances of the *Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated July 17, 2011 (the "*Plan*"). A copy of the Plan is attached hereto as **Exhibit A**.

The Plan provides for the reorganization of the Debtor as a going concern. Among other things, the Plan contemplates the following:

- on or after the Effective Date[1], the Holders of Other Priority Claims will be repaid in full by the Debtor or Reorganized OPD;

- the Holder of First Lien Debt will receive a paydown of $5 million on the principal amount of its Claim and, subject to the AFP Exit Documents, will (i) retain its Liens on the Debtor's assets, (ii) receive an amended mortgage and note in the amount of $47,252,801.26 payable over seven (7) years at an interest rate of 4% per annum and at varying amortization levels with a balloon payment at the maturity date and (iv) receive an exit fee payable at the maturity date under the AFP Exit Documents in the amount of 1% of the principal amount of the new note;

- the Holders of Allowed General Unsecured Claims, other than Holders of Other Unsecured Claims and Indemnification Claims, will receive, on a *pro rata* basis, a share of a $500,000 aggregate cash distribution on the Distribution Date;

- the Holders of Other Unsecured Claims will receive no distribution on account of their Claims and the Other Unsecured Claims will be transferred to and become the obligation of Tiburon on the Effective Date;

- the Holders of Indemnification Claims will have their Claims reinstated against the Reorganized OPD to the extent that such Claims become Allowed; and

- Tiburon's outstanding OPD Equity Interest will not receive any cash distribution on account of such Interest; *provided*, *however*, that in exchange for its assumption of Other Unsecured Claims and contributions to the Chapter 11 Case and the Plan, on the Effective Date, Tiburon's Equity Interests will be restructured and diluted in accordance with the terms of the Fourth Amendment, the Fifth Amendment and the Capital Contribution Agreement.

**THE DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THIS ESTATE AND PROVIDES THE BEST RECOVERY TO CREDITORS. AT THIS TIME, THE DEBTOR DOES NOT BELIEVE THAT THERE IS A VIABLE ALTERNATIVE FOR COMPLETING THIS CHAPTER 11 CASE OTHER THAN THROUGH CONFIRMATION OF THE PLAN. THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

**THE PROJECTED RECOVERIES SET FORTH HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S**

---

[1]    All terms not otherwise defined herein shall have the meaning given to them in the Plan.

CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[2]

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtor is seeking to have confirmed by the Bankruptcy Court.  The Debtor believes that the Plan is in the best interests of all creditors.  The Debtor urges all Holders of Claims and Interests entitled to vote on the Plan to vote in favor of the Plan.

**The summary of the Plan provided above is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.**

The Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtor believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

No representations concerning the Debtor or the value of the Debtor's property have been authorized by the Debtor other than as set forth in this Disclosure Statement.  Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any Claim Holder entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtor has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtor's independent auditors unless explicitly stated otherwise herein.

---

[2]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtor's business operations and general economic conditions.

The Debtor makes statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  The Debtor considers all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Case;

- the Debtor's expected future financial position, liquidity, results of operations, profitability and cash flows;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements; and

- projected general market conditions.

Statements concerning these and other matters are not guarantees of the Debtor's future performance.  Such statements represent the Debtor's estimates and assumptions only as of the date such statements were made.  There are risks, uncertainties and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those they may project and the Debtor undertakes no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtor's ability to develop, confirm and consummate the Plan;

- the Debtor's ability to reduce its overall financial leverage;

- the potential adverse impact of the Chapter 11 Case on the Debtor's operations, management and staff, and the risks associated with operating the business in the Chapter 11 Case;

- customer response to the Chapter 11 Case;

- inability to have claims discharged/settled during the chapter 11 proceeding;

- general economic, business and market conditions, including the volatility and disruption in the capital, credit and real estate markets;

- interest rate fluctuations;

- exposure to litigation;

- declines in the commercial and residential development markets;

- dependence upon key personnel;

- ability to implement cost reduction initiatives in a timely manner;

- financial conditions of the Debtor's customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters;

- inability to implement business plan; and

- the effects of governmental regulation on the Debtor's business.

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtor to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

Your ability to vote and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold. A summary of the Classes of Claims and Interests (each, a category of Holders of Claims or Interests as set forth in Section VIII of this Disclosure Statement and Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, which we refer to as a "*Class*") and their respective voting statuses is set forth below.

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in the Debtor.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | First Lien Debt Claim | Impaired | Entitled to Vote |
| 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Other Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Indemnification Claims | Impaired | Entitled to Vote |
| 5 | OPD Equity Interests | Impaired | Entitled to Vote |

In the event that the Plan is not confirmed, there is no assurance that the Debtor will be able to reorganize its business. If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims would ultimately receive in respect of their Claims. Moreover, non-Confirmation of the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of this or of a liquidation scenario, see "Confirmation Of The Plan - Best Interests of Creditors/Liquidation Analysis" below and the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

All parties in interest will receive the notice of the hearing on the Confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: www.njb.uscourts.gov or by contacting counsel for the Debtor.

The Plan provides for customary releases of the Released Parties, as fully set forth in Article IX of the Plan.

This Disclosure Statement, accompanied by a ballot to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests entitled to vote on the Plan. If you are a Holder of Claims in the following Classes, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

- **Class 1 (First Lien Debt Claim)**

- **Class 2 (General Unsecured Claims)**

- **Class 3 (Other Unsecured Claims)**

- **Class 4 (Indemnification Claims)**

- **Class 5 (OPD Equity Interests)**

Lowenstein Sandler PC, the Debtor's restructuring counsel, will serve as the voting agent for all claims and generally oversee the voting process (the "*Voting Agent*"). The Voting Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

**The deadline to vote on the Plan is 5:00 p.m., (prevailing Eastern Time), on _____, 2011.**

---

**BALLOTS**

Ballots must be actually received by the Voting Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on _____ \_\_, 2011 at the following address:

**Lowenstein Sandler PC**
**Attn: Lisa Bonito**
*OPD Balloting*
**65 Livingston Avenue**
**Roseland, NJ 07068**


If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number:

**1-973-597-2500**

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.

Any ballot that is properly executed by the Holder of a Claim or Interest, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot per each Claim held.  By signing and returning a ballot, each Holder of a Claim or Interest in Classes 1, 2, 3, 4 and 5 will certify to the Bankruptcy Court and the Debtor that no other ballots with respect to such Claim and/or Equity Interest have been cast or, if any other ballots have been cast with respect to such Class of Claims, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2011 to take place at \_\_:\_\_ \_\_.m. (prevailing Eastern Time) before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of New Jersey, Courtroom # 3, located at Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtor, and certain other parties, by no later than _____ \_\_, 2011 at 5:00 p.m. (prevailing Eastern Time).  Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtor will continue to operate its business going forward using cash from operations (including up to $7 million to be contributed by OPN and Forest Lake Realty, LLC) that will be utilized to implement the Reorganized Debtor's business plan.

**IN THE OPINION OF THE DEBTOR, THE PLAN PROVIDES FOR A LARGER DISTRIBUTION TO THE DEBTOR'S CREDITORS THAN WOULD OTHERWISE RESULT FROM ANY OTHER AVAILABLE ALTERNATIVE.  THE DEBTOR BELIEVES THE PLAN, WHICH CONTEMPLATES A RESTRUCTURING OF OPD'S SECURED AND UNSECURED INDEBTEDNESS, IS IN THE BEST INTERESTS OF ALL CREDITORS AND PARTIES IN INTEREST.  ANY OTHER ALTERNATIVE, INCLUDING A SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS OR LIQUIDATION**

**UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, WOULD REALIZE OR RECOGNIZE A LESSER VALUE THAN THE VALUE ACHIEVED UNDER THE PLAN.  THUS, THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**III.    THE DEBTOR'S STRUCTURE AND BUSINESS OVERVIEW**

**A.    OPD'S ORGANIZATIONAL STRUCTURE**

The Debtor primarily conducts its business under its trade name of Ocean Place Resort & Spa.  The Debtor has commenced this Chapter 11 Case in large part because the Debtor has defaulted under the Prepetition Credit Facility, described in more detail below, and the holder of said facility has sought to foreclose on the Debtor's assets.  The following chart generally depicts OPD's prepetition organizational and governing structure:

**Organizational Chart**



**B.    COMPANY OVERVIEW**

Tiburon Ocean Place LLC, the related predecessor to OPD, originally purchased the landmark property generally known as the Ocean Place Resort & Spa in 2000, chiefly as an operating hotel and resort with certain zoning entitlements for potentially major additional development.  In 2006, the property was refinanced and all of the assets and liabilities of Tiburon Ocean Place LLC were simultaneously transferred into OPD.

The resort property is located on the Atlantic beachfront in Long Branch, New Jersey, just 55 miles south of New York City and 82 miles north of Atlantic City.  The existing resort is sited on 17-acres featuring approximately 1,000 feet of ocean frontage and is improved with a 254-room hotel that includes 40,000 square feet of meeting space, three restaurants, a bar/lounge, a full-service spa, and numerous resort amenities.  An aerial west-view of the property is below.

For 25 years, Long Branch has proceeded on a major redevelopment initiative that seeks to establish the City as a premier resort destination and enhance its year round appeal. One example of this revitalization is Pier Village, a successful commercial and residential mixed use development, the first phase of which was built in 2005 and is located adjacent and immediately to the south of OPD. This first phase of the Pier Village development consists of 320 rental apartments and more than 100,000 square feet of retail shops that have maintained high occupancy levels since opening. A second phase was also built out and completed, and the third and final phase is in the final approval and planning process.

Another adjacent and highly successful project is Beachfront North, which is a residential community located immediately to the north of OPD and features a New England design. Built in 2005, Beachfront North is comprised of the Bluffs and the Grand Resorts, which consist of 104 townhomes and 179 condominium units, respectively, which have been sold out in a successful development. Minor additional development at the north end of this project is now underway which, when complete, will fully build out this development.

On August 22, 2007, OPD signed a Redevelopment Agreement with the City of Long Branch and other agencies, providing for substantial and specific development on the site to include 60 new hotel rooms, 200 "condo-hotel" units, 274 residential units, 250,000 square feet of retail space and 103,000 square feet of office space. With the proposed redevelopment, OPD would be the centerpiece of the entire Long Branch Oceanfront Redevelopment and the largest oceanfront resort and conference center on the New Jersey shore between New York City and Atlantic City. The development embodied in the Redevelopment Agreement was projected to increase the improved square footage of the property approximately 700% from the current 214,481 square feet to 1,496,163 square feet. With its location in a high traffic corridor, financial opportunities are major for a flexible redevelopment of this property that is sensitive to the specifics of demand over the coming years. Due to the flexibility required to meet evolving market conditions, it is expected that the ultimate build out of this property, subject to City and various agency approvals, will be limited in scope to that embodied in the Redevelopment Agreement.

The City of Long Branch has asserted that, among other things, OPD is in breach of the Redevelopment Agreement. OPD disputes that assertion. While OPD's original plans of the site were very ambitious and were significantly impacted by the real estate market and subsequent needs of the community, OPD believes that its redevelopment rights under the Redevelopment Agreement have value. Furthermore, the Debtor continues to believe that the potential redevelopment of the property could have a positive impact on the Debtor's business operations and the community at large. The Debtor intends to negotiate in good faith with the City of Long Branch to modify the Redevelopment Agreement to fit the current goals of the Debtor and the needs of the community. While the Debtor is hopeful that it will be able to modify the Redevelopment Agreement on a consensual basis with the City of Long Branch, the failure to reach a consensual resolution may require that the Redevelopment Agreement be rejected by the Debtor.

As of the Petition Date, all personnel working at the property were employed and paid by an affiliate of the resort's property manager, The West Paces Hotel Group, LLC, pursuant to the terms of an Operating Agreement dated October 24, 2005. Depending on the season - with the summer season being the peak - the number of people employed full time at the Debtor's property ranges between approximately 95 and 340. The costs of the employees at the resort were part of the "Gross Operating Expenses" that were reimbursed to The West Paces Hotel Group, LLC under the Operating Agreement. None of the employees are represented by labor unions and there are no collective bargaining agreements in place. OPD considers its relationship with the employees to be good.

Following the Petition Date, the Debtor severed its relationship with The West Paces Hotel Group, LLC and its affiliate. Coakley & Williams Hotel Management Company now manages the Debtor's operations and A-1 Contract Staffing II, LLC, employs substantially all personnel working at the premises.



## C.    REVENUES

As set forth above, OPD derives revenues from the operation of its hotel, restaurants, and spa and provision of related amenities to its guests and patrons.  In addition to these sources of revenue, OPD hosts events such as weddings, birthdays and other family and business gatherings.  The Debtor has generated positive earnings from operations (net operating income) every year since acquisition. Steady growth in net operating income was recorded in the years 2003 through 2007.  Like many similar properties, the economic declines from 2007 through April 2010 severely harmed revenues and the net operating income from the property.  However, since April of 2010, revenues have begun to recover and "trailing 12 months" net operating income of the property has more than doubled from the prior low reflected in April 2010.

Operational prospects appear to be positive with significant to substantial improvements in the hotel operating environment expected to continue through the year 2014.  Net operating income of the property for 2010 was $3,546,729, with a 26% increase in net operating income to $4,489,921 budgeted for 2011 by The West Paces Hotel Group LLC, the resort's managing agent as of the Petition Date.

## D.    OPD'S PREPETITION CAPITAL STRUCTURE

### (i)    *Secured Loans*

As of the Petition Date, the Debtor's secured obligations totaled $52,328,189.94.  The debt obligations arose under the Loan Agreement dated as of April 25, 2006, Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 3, 2006 and effective as of April 25, 2006 and two promissory notes in the amount of $44 million and $8.875 million (together with other documents related thereto, as amended from

time to time, the "***Loan Documents***" and obligations thereunder the "***Loan Obligations***"), by and among Barclays Capital Real Estate Inc ("***Barclays***") as lender and OPD as borrower.[3]   OPD's obligations under the Loan Documents are conditionally guaranteed by William R. Dixon, Jr., Tiburon Capital LLC, Tiburon Ocean Place LLC, David L. Orr and Orr Partners, LLC.  The Debtor's obligations under the Loan Documents are secured by Liens on and security interests in substantially all of its assets (the "***Lender's Collateral***").  The borrowings under the Loan Documents matured on January 9, 2008 (the "***Maturity Date***").

From their inception and up to the Maturity Date of the borrowings set forth in the Loan Documents, the Debtor was current in its obligations to Barclays. For approximately two (2) years from the Maturity Date through January 2010, OPD paid Barclays interest at the default rate of interest of approximately 9.8% per annum. During this period, the Debtor used its revenues to pay default interest to Barclays and at the same time operated the resort.

On or about August 12, 2010, the Superior Court of New Jersey entered a Final Judgment against OPD, among other parties, awarding Barclays $53,205,177.94, plus interest from September 30, 2009, on account of the Loan Documents.  On or about June 29, 2010, Barclays was awarded additional attorney fees in the amount of $95,000.

On or about October 26, 2010, AFP purchased from Barclays all of Barclays' rights under the Loan Documents for $40.5 million. By an Assignment of Judgment of the same date, AFP acquired from Barclays its rights under the Final Judgment in the amount of $53,300,177.94 (consisting of the amount of the August 12, 2010 judgment and the June 29, 2010 award of attorney fees), plus interest to be calculated at the Court Rule rates from August 12, 2010.

Shortly after purchasing Barclays' interest under the Loan Documents in the Lender's Collateral and obtaining an Assignment of the Judgment, AFP utilized its control over a lockbox account, which is the Debtor's depository account, and swept the Debtor's lockbox account by making two withdrawals: $3 million on or about December 7, 2010 and $1 million on or about January 5, 2011.  Following the purchase of Barclays' claim against the Debtor, AFP received a foreclosure judgment and scheduled a sheriff foreclosure sale of the Debtor's assets for February 22, 2011.  On February 15, 2011, one week before the scheduled foreclosure sale, the Debtor filed this Chapter 11 Case to protect the interests of all of its creditors and stakeholders.

Based on the amount of the August 12, 2010 judgment and the June 29, 2010 award of attorneys fees, and taking into consideration the applicable interest rate (non default contract rate from 10/1/09 through 8/12/10; 3.5% simple interest per N.J.S.A. from 08/13/10 through 12/31/10; 2.5% simple interest per N.J.S.A. from 01/01/11 through 02/15/11, together with AFP's protective advances, sweeps of the Debtor's cash and other payments by OPD applied as payments of principal, the First Lien Debt Claim as of the Petition Date was $52,328,189.94.[4]

---

[3] In connection with the incurrence of the Loan Obligations under the Loan Documents, four (4) appraisals have been performed of the Debtor's assets.  In a "Complete Appraisal Self Contained Report" dated as of February 24, 2006 and prepared by CBRE Valuation & Advisory Services ("**CBRE**"), the "as is" value of the Debtor's hotel was set forth at $53.3 million and its "Excess Land Residual" was valued at $33.3 million, for a total value of $86.6 million.  In a "Restricted Appraisal Report" dated as of February 26, 2007 and also prepared by CBRE, the "as is" value of the Debtor's hotel was set forth at $59.4 million and its "Excess Land - As Is" was valued at $104 million, for a total value of $163.4 million.  A third appraisal by CBRE dated July 1, 2008 and titled "Complete Appraisal Self Contained Report," ascribed the "as is" value of $60.8 million to the Debtor's "Land Residual," without consideration of the existing hotel improvements. A fourth appraisal dated October 7, 2008, titled "Self-Contained Appraisal Report" and prepared by HVS Valuations & Consulting, ascribed the "as is" value of $60.1 million to the existing "Hotel", without consideration of the residual land or development rights.

[4] Calculation of interest pursuant to N.J.S.A. § 4:42-11 is required.  The August 12, 2010 judgment provides for the payment of lawful interest and the October 26, 2010 Assignment of Judgment prepared by Barclays confirms that interest shall be calculated "at the Court Rule rates from April 12, 2010".  That statutory rate of interest applies to claims memorialized in judgments is recognized by the merger doctrine. Under New Jersey law, a mortgage "merges" into a foreclosure judgment, so that the terms of the judgment (not the mortgage) apply.
(Continued…)

On June 14, 2011, AFP filed a proof of claim (Claim No. 64) in the Chapter 11 Case in the amount of "$57,245,372.26 (plus attorneys' fees and costs)".  As set forth herein, the Debtor disagrees with AFP's calculations of its claim amount.

For purposes of the Plan, assuming the Debtor's emergence from the Chapter 11 Case as of 9/30/11 and taking into account payment of post-petition interest (and principal due to the lower claim amount as of the Petition Date than originally forecasted), AFP's allowed Claim is $52,252,801.26 or as may be determined by the Bankruptcy Court.

### (ii)    Unsecured Loans

The Debtor's unsecured loan obligations include $49,584,684.85 to Tiburon Shores LLC, $6,211,152.94 to Tiburon Capital, LLC, $3,947.64 to Boyd and Laura Ball, $207,211.21 to William Dixon, Jr., and $18,960.77 to TCL New Jersey Corp.  In exchange for Tiburon Ocean Place LLC's retention of its diluted equity interest in the Reorganized OPD, these claims, totaling $56,025,957.40 and classified as Other Unsecured Claims, and will receive no cash distribution from the Debtor under the Plan.

### (iii)    Trade Claims

On the Petition Date, the Debtor had approximately $1.1 million in unpaid trade claims.

### (iv)    Indemnity Obligations

OPD's obligations under the Loan Documents are presently guaranteed, jointly and severally, by William R. Dixon, Jr., Tiburon Capital LLC, Tiburon Ocean Place LLC, David L. Orr and Orr Partners, LLC.  These parties are defendants in the pending Guaranty Litigation.

In addition, the City of Long Branch (the "**City**") and OPD entered into a purchase and sale agreement for real property known as the "Abbotsford Property" on December 29, 2006.  In connection therewith, on March 30, 2007, John F. Dixon, William R. Dixon, Jr. and David L. Orr executed a promissory note (the "**City Note**") in favor of the City in the amount of $3,015,370.52.  Pursuant to the Assignment, Assumption and Consent Agreement Concerning Abbottsford Promissory Note of the same date, Obligations under the City Note were thereafter assigned to and assumed by Tiburon Capital LLC and Orr Partners, LLC.  Although John F. Dixon, William R. Dixon, Jr. and David L. Orr personally guaranteed, jointly and severally, the obligations under the City Note pursuant to a Guaranty dated March 30, 2007, John F. Dixon's obligations have been discharged.

In connection with the promissory notes, the City filed a complaint against the obligors and guarantors in connection with the City Note in the Superior Court of New Jersey, Docket No. MON-L-4604-08 (the "**City Action**").  On or about August, 2010, consent orders have been entered in the City Action in the amount of $3,656,669.08 (plus post-judgment interest pursuant to New Jersey Court Rules) against William R. Dixon, Jr., David L. Orr and Orr Partners, LLC and Tiburon Capital LLC.

With respect to the above obligations, one or more of the obligors has asserted that OPD is liable to it for the underlying obligations based on certain indemnification provisions set forth in OPD's Operating Agreement.

---

*See, e.g., In re A&P Diversified*, 467 F.3d 337,341-42 (3d Cir. 2006); *Virginia Beach Federal v . Bank of New York*, 299 N.J. Super. 181, 188 (App. Div. 1997); *Washington Mutual v. Wroblewski*, 396 N.J. Super. 144, 149-150 (Ch. Div. 2007); *see also In re Lehal Realty*, 112 B.R. 588, 589 (Bankr. S.D.N.Y. 1990).  Moreover, *res judicata* and related doctrines (issue preclusion, collateral estoppel) preclude disputes regarding the applicability of an interest rate. *Lehal Realty*, 112 B.R. at 589 (doctrine of merger based on *res judicata*); *First Union National Bank v. Penn Salem Marina*, 190 N.J. 342, 344-45 (2007) (holding that after lender obtains judgment at law, lender cannot obtain different amount in later foreclosure proceeding based on same mortgage).

*(v)*        ***Membership Interests***

On the Petition Date, Tiburon Ocean Place LLC was the sole member of OPD.  TCL New Jersey Corp was OPD's manager. For a more detailed description on membership interests and the relationship between various parties in the corporate structure please see Section III.A in this Disclosure Statement.

## IV.    SUMMARY OF LEGAL PROCEEDINGS

### A.    PENDING LEGAL PROCEEDINGS OUTSIDE THE BANKRUPTCY COURT

The Debtor is involved in litigation from time to time in the ordinary course of its business. The Debtor believes the ultimate resolution of these matters will not have a material effect on its financial position or results of operations or cash flows.  In addition to this "ordinary course" litigation, the guarantors under the Loan Documents are defendants in an action commenced against them following the Petition Date by AFP in a New York Supreme Court, Index No. 650436/11 (the "***Guaranty Litigation***").  Generally, and among other things, through the Guaranty Litigation, AFP seeks payment from the defendants on account of the outstanding Loan Obligations.  The parties in the Guaranty Litigation are in their initial stages of discovery.  The Debtor believes that the Guaranty Litigation may negatively impact OPD's reorganization efforts and, through the Plan, the Debtor seeks to enjoin the Guaranty Litigation against the defendants (the "***Guaranty Defendants***") subject to OPD's compliance with the Plan.  The Guaranty Litigation, if not enjoined, may adversely affect the Debtor and its prospects of emerging from the Chapter 11 Case.  Among other things, the Capital Contribution Agreement requires that certain of the Guaranty Defendants give their full attention to the Reorganized OPD post the Effective Date.  It also requires that the Guaranty Litigation be resolved by the Plan.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILING

A number of factors contributed to the Debtor's decision to commence the Chapter 11 Case.  Although the Debtor's business is operationally sound, the Debtor's substantial funded debt burden, liquidity constraints and stagnation in the hospitality industry, combined with adverse changes in the capital markets and U.S. economy, affected the Debtor's ability to meet its debt obligations.  Also, as set forth above, the main cause of the filing of this Chapter 11 Case was AFP's obtaining a judgment against OPD based on the Debtor's defaults under the Loan Documents and scheduling of a foreclosure sale for February 22, 2011.

### A.    OPD'S DEBT BURDEN

From an operational standpoint, the Debtor had been weathering the storm caused by the decline in the real estate markets and virtual collapse of capital markets.  While the Debtor had felt signs of recovery, the Debtor's level of indebtedness and its payment of interest at the default rate required that essentially all cash flow from operations be dedicated to debt service, thus making it unavailable for other purposes.  Moreover, the terms of the Debtor's prepetition indebtedness gave AFP virtual control, via a lockbox account, over the Debtor's operations. From the Maturity Date through the Petition Date alone, AFP and Barclays have swept the Debtor's operating account in the aggregate amount of $15,866,814.15, $4 million of which was swept by AFP in the seventy-five (75) days immediately preceding the filing of this Chapter 11 Case.

### B.    PREPETITION ATTEMPTS TO REFINANCE THE DEBTOR'S LOAN OBLIGATIONS

Prior and subsequent to the Maturity Date under the Loan Documents, OPD solicited a full refinance of the secured obligations from over 100 prospective lenders without success due to the withdrawal of virtually the entire lending community from the business of making commercial loans triggered by the global financial meltdown and economic chaos. Various formal and informal "workout" proposals submitted by the Debtor were not acceptable to Barclays or, subsequently, AFP.  Because AFP scheduled a foreclosure sale of the Debtor's assets, it became clear that the filing of this Chapter 11 Case was the only option to maintain value of the Debtor's business and restructure financial affairs for the benefit of all stakeholders.

## VI.    THE COMMENCEMENT OF THE CHAPTER 11 CASE

On February 15, 2011, the Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of New Jersey seeking relief under the provisions of chapter 11 of the Bankruptcy Code to effectuate a restructuring of the Debtor's funded debt obligations.

The Chapter 11 Case is being administered under the caption *Ocean Place Development LLC*, Case No. 11-14295 (MBK).  The Debtor continues to operate its business and manage its property as debtor in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### A.    FIRST DAY RELIEF

The Debtor entered into bankruptcy after a careful review of its business operations and cash requirements to minimize the impact of the Chapter 11 Case on its day-to-day business operations.  Integral to this transition were certain "first day" orders entered by the Bankruptcy Court to provide the Debtor, among other things, flexibility in cash management, the payment of outstanding employee wages, health benefits, and certain other employee obligations, the ability to honor certain prepetition obligations.

On the Petition Date and thereafter, the Debtor filed several motions seeking orders authorizing the Debtor to pay various Prepetition Claims.  Entry of these orders eased the strain on the Debtor's relationships with staff, vendors, customers and taxing authorities as a consequence of the commencement of the Chapter 11 Case.  Among other things, these orders authorized the Debtor to: (a) honor customer obligations and continue certain customer obligations and practices [Docket No. 167]; (b) pay and honor all prepetition obligations associated with the employee obligations and to continue to pay wages and honor employee benefit programs, within certain limitations imposed by the Bankruptcy Code [Docket No. 19]; (c) continue to operate the cash management system [Docket No. 21].  Additionally, on March 16, 2011, the Bankruptcy Court entered an order which prohibited utility providers from altering, refusing or discontinuing utility services to the Debtor solely on the basis of the commencement of this Chapter 11 Case or a debt owed by the Debtor to such utility provider for services rendered before the order for relief that was not paid when due [Docket No. 88].  The order also created both procedures for utility providers to request additional adequate assurance in the event that a utility provider is not satisfied with the assurance of payment provided, as well as procedures for the Debtor to challenge these requests.  In addition to these requests, the Debtor severed its relationship with The West Paces Hotel Group LLC, its manager at the property [Docket No. 123], and replaced it with Coakley & Williams Hotel Management Company [Docket No. 113].  Further, the Debtor retained A-1 Contract Staffing II, LLC, an employee staffing agency, to, among other things, administer payroll and provide other employee-related services.

### B.    CASH COLLATERAL

On the Petition Date, OPD filed a motion requesting permission to use AFP's cash collateral and providing AFP with related adequate protection.  AFP opposed the Debtor's motion for use of its cash collateral and, in addition, filed a motion seeking to dismiss the Chapter 11 Case and, alternatively, requested relief from the automatic stay.  The Debtor opposed AFP's requests.  The Bankruptcy Court held a final hearing on these motions on March 9, 2011.  Subsequently, by an order entered on March 16, 2011, the Bankruptcy Court denied AFP's motion to dismiss the Chapter 11 Case and adjourned the hearing on AFP's motion for relief from the automatic stay to July 18, 2011 [Docket No. 92].  By an order dated March 11, 2011, the Bankruptcy Court granted the Debtor's motion to use AFP's cash collateral and scheduled a further hearing on the motion for July 18, 2011 [Docket No. 77].  Subsequently, on March 31, 2011, the Bankruptcy Court issued an *Opinion* setting forth its ruling on the Debtor's cash collateral motion in further detail.  *See In re Ocean Place Development LLC*, 447 B.R. 726 (Bankr. D.N.J. 2011).

### C.    DEBTOR-IN-POSSESSION FINANCING

On March 11, 2011, OPD filed an emergency motion seeking approval of up to $1.5 million in debtor in possession financing (the "**DIP Facility**").  The DIP Facility was provided by OPN Acquisitions, LLC ("**OPN**" or

"***DIP Lender***").  In connection with the DIP Facility, OPN required a 50% equity stake in the Debtor or its successor and said request was memorialized in a Fourth Amendment to OPD's Operating Agreement.

On March 25, 2011, over AFP's objection and pursuant to changes agreed to by the Debtor and OPN, the Bankruptcy Court entered a final order approving the DIP Facility [Docket No. 112].  Through the DIP Facility, Tiburon Ocean Place LLC pledged to OPN (or its designee) 50% of its interest in OPD.  Pursuant to the Fourth Amendment to Operating Agreement [Docket No. 111], subject to confirmation by the Bankruptcy Court of a plan of reorganization in this Chapter 11 Case, Tiburon Ocean Place LLC, the sole member of OPD as of the Petition Date, agreed to transfer to OPN 50% of its interest in OPD.  In exchange, and subject to: (1) unanimous consent of OPN and Tiburon Ocean Place LLC; (2) repayment of the DIP Facility in full and termination/cancellation thereof; and (3) confirmation by the Bankruptcy Court of a plan of reorganization that has been approved by OPN and Tiburon Ocean Place LLC, OPN is required to contribute up to $2 million in working capital and to arrange for additional capital in the form of debt or equity in the maximum amount of $5 million to be used consistent with a plan of reorganization confirmed in this Chapter 11 Case.  In addition, upon the effective date of a plan of reorganization, the Fourth Amendment to Operating Agreement grants OP Management, LLC managerial rights with respect to the Reorganized OPD.

### D.    CAPITAL CONTRIBUTION AGREEMENT

On or about June 21, 2011, and subject to Bankruptcy Court approval, the Debtor entered into a Capital Contribution Agreement contemplated in the Forth Amendment approved in connection with the DIP Facility.  The Capital Contribution Agreement, annexed hereto as **Exhibit E**, enables the Reorganized OPD to obtain up to $5 million in working capital from Forest Lake Realty, LLC in exchange for, *inter alia*, a 15% equity interest in Reorganized OPD, which equity interest will dilute OPN and Tiburon each to 42.5% interest.

## VII.    RETENTION OF RESTRUCTURING AND OTHER PROFESSIONALS

To assist the Debtor in carrying out its duties as debtor in possession and to represent its interest in the Chapter 11 Case, the Debtor obtained Bankruptcy Court approval to retain Lowenstein Sandler PC as its restructuring attorneys.

In addition to Lowenstein Sandler, the Debtor received Bankruptcy Court authorization to retain certain other attorneys and professionals to represent or assist it in a variety of situations arising in the ordinary course of the Debtor's business in matters unrelated to the Chapter 11 Case.  *See Order (I) Authorizing The Retention And Employment Of Stephen M. Herbstman, M. S., C.P.A. As Tax Accountant To The Debtor, Nunc Pro Tunc To March 1, 2011 And (II) Approving Related Thereto Fees* [Docket No. 160]; *Order Pursuant To 11 U.S.C. §§ 327(e), 328, And 1107 And Fed. R. Bankr. P. 2014 Authorizing The Employment And Retention Of Morgan Melhuish Abrutyn As Special Counsel To The Debtor* [Docket No. 136]; *Order Authorizing The Retention And Employment Of Stephen M. Herbstman, M. S., C.P.A. As An Auditor To The Debtor, Nunc Pro Tunc To June 20, 2011* [Docket No. 214].

## VIII.    DEVELOPMENTS DURING THE CASE

### A.    MOTION(S) TO REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is a party to numerous contracts and lease agreements that are entered into in the ordinary course of its business operations.  After analyzing and reviewing the terms and conditions of many of these agreements, the Debtor determined that some of the agreements were no longer beneficial to the Debtor's ongoing business operations and would constitute an unnecessary drain on the Debtor's resources.  Accordingly, to avoid incurring administrative expense claims during this Chapter 11 Case with respect to agreements that were no longer of utility to the Debtor, the Debtor sought to reject various executory contracts and unexpired leases.  To date, the Debtor has rejected its management agreement with The West Paces Hotel Group, LLC, effective as of March 31, 2011.  The Debtor may reject other executory contracts or unexpired leases prior to confirmation of the Plan.

B.      **ENTRY INTO AGREEMENTS**

*(i)*        *Coakley & Williams*

On March 23, 2011, by an order of the Bankruptcy Court, the Debtor retained Coakley & Williams Hotel Management Company ("***CW***") as its new management company [Docket No. 113]. CW's engagement began on April 1, 2011. It is expected that CW will remain the management company for the Reorganized OPD pursuant to a revised Hotel Management Agreement included in the Plan Supplement.

*(ii)*       *A-1 Contract Staffing*

By an order of the Bankruptcy Court dated April 20, 2011, the Debtor entered into an agreement with A-1 Contract Staffing II, LLC ("***A-1***"), effective as of April 1, 2011 [Docket No. 153]. Pursuant to the agreement, A-1 employs all personnel working at the Debtor's premises and provides related services. It is expected that A-1 will continue to provide services to the Reorganized OPD.

C.      **SETTLEMENT WITH WEST PACES**

On June 17, 2011, the Debtor filed a motion with the Bankruptcy Court seeking approval of a compromise by and between the Debtor and The West Paces Hotel Group, LLC [Docket No. 204]. The compromise, approved by the Bankruptcy Court on July 14, 2011 [Docket No. 224], (i) may result in the elimination of approximately $11 million of claims asserted against the Debtor's estate and (ii) resolves West Paces' motion seeking the allowance and payment of a postpetition administrative expense claim [Docket No. 137]. Under the compromise, the Debtor retained the right to conduct an audit of its operations, bring claims against West Paces and object to certain employee claims.

D.      **EXCLUSIVITY**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "*Exclusive Filing Period*"). If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptance of the Plan (the "*Exclusive Solicitation Period,*" and together with the Exclusive Filing Period, the "*Exclusive Periods*"). During these Exclusive Periods, no other party in interest may file a competing plan of reorganization, however, a court may extend these periods upon request of a party in interest. The Debtor's initial Exclusive Filing Period and Exclusive Solicitation Period were set to expire on June 15, 2011 and August 15, 2011, respectively.

On May 13, 2011, the Debtor filed a motion seeking to extend the Exclusive Periods [Docket No. 174]. On June 20, 2011, the Court entered an order extending the Exclusive Periods through and including July 31, 2011 and September 29, 2011, respectively [Docket No. 207].

E.      **CLAIMS BAR DATE**

The Bankruptcy Code provides for the bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose claim is not scheduled in the debtor's schedules or whose claim is scheduled as disputed, contingent or unliquidated must file a proof of claim.

On March 4, 2011, a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines* was filed in this Chapter 11 Case [Docket No. 57] (the "***Notice***"). Pursuant to the Notice, (a) June 27, 2011 was established as the deadline for filing Claims in this Chapter 11 Case and (b) August 15, 2011 was established as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in this Chapter 11 Case ((a) and (b) together, the "*Bar Dates*").

## IX.    DESCRIPTION OF THE PLAN OF REORGANIZATION

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan itself and the documents therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtor, the Debtor's Estate, the Reorganized Debtor, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

### A.    ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Other Priority Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

#### a.    General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) on or as soon as reasonably practicable after the Effective Date, (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtor's business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

#### b.    DIP Facility Claim

The DIP Facility Claim under the DIP Credit Agreement has been repaid by the Debtor in full.

#### c.    CW Claim

On March 23, 2011, the Bankruptcy Court entered an *Order Authorizing the Debtor's Entry Into a Management Agreement with CW* (the "CW Order").   Paragraph two (2) of the CW Order reserved for further consideration by the Bankruptcy Court of the payment of $100,000.00 to Bridgeway Capital LLC.  Because CW has been and continues to perform all of the services required by its engagement agreement and certain additional services normally not performed by a hotel management company, CW is entitled to collect the portion of its management fee withheld by the CW Order and said fee should be payable pursuant to the terms of the CW agreement approved by the CW Order.  Bridgeway Capital LLC will not receive any payment on account of this previously reserved payment.

#### d.    Professional Compensation

##### (i)    Fee Claims

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date; *provided* that the Reorganized Debtor may pay retained Professionals or other Entities in the ordinary course of business after the Confirmation Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

*(ii)*  Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtor and its Professionals through and including the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

  **e.**  **Administrative Claim Bar Date**

Except as otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or its property and such Administrative Claims shall be deemed discharged as of the Effective Date. The Debtor estimates that Administrative Claims, inclusive of professional fees, are between $850,000 and $950,000.

  **2.**  **Priority Tax Claims**

    **a.**  **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtor, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court. The Debtor estimates that Priority Tax Claims are between $29,000 and $40,000.

  **3.**  **Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtor, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim; (2) Cash in an aggregate amount of such Allowed Other Priority Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court. The Debtor estimates that Other Priority Claims are between $0.00 and $190,000.

  **4.**  **Statutory Fees**

On the Distribution Date, Reorganized OPD shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Confirmation Date, Reorganized OPD shall pay the applicable

U.S. Trustee fees until the entry of a final decree in each Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

### B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

#### 1.    Classification of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

#### 2.    Summary of Classification

This Plan constitutes a chapter 11 plan of reorganization for the Debtor.

The following chart represents the general classification of Claims and Interests against the Debtor pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | First Lien Debt Claim | Impaired | Entitled to Vote |
| 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Other Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Indemnification Claims | Impaired | Entitled to Vote |
| 5 | OPD Equity Interests | Impaired | Entitled to Vote |

#### 3.    Treatment of Claims and Interests

To the extent a Class contains Allowed Claims or Allowed Interests with respect to the Debtor, the treatment provided to each Class for distribution purposes is specified below:

##### a.    Class 1 - First Lien Debt Claim

(i)    *Classification:*  Class 1 consists of the First Lien Debt Claim.

(ii)    *Allowance:*  The First Lien Debt Claim shall be Allowed and deemed to be Allowed Claim in the amount of $52,252,801.26.

(iii)    *Treatment:*  Holder of First Lien Debt Claim will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of its First Lien Debt Claim, (i) a Lien on and security interest in substantially all of the Debtor's assets, (ii) payment in the amount of $5 million which shall be applied to reduce the principal amount of the First Lien Debt Claim, (iii) a mortgage and promissory note payable over seven (7) years at an interest rate of 4% per annum, with monthly interest-only payments in year one, monthly payments in year two sufficient to amortize over thirty (30) years the principal balance existing at the end of the first year, monthly payments in year three sufficient to amortize over twenty-five (25) years the principal balance existing at the end of the second year, and monthly payments in year four and thereafter sufficient to amortize over twenty (20) years the principal balance existing at the end of the third year, with a balloon payment at the maturity date and (iv) an exit fee of 1% of the principal amount of the new note payable at maturity; *provided*, *however* that the First Lien Debt Claim shall be governed in all respects by the AFP Exit Documents.  The AFP Exit Documents shall be filed with the Plan Supplement

and shall contain standard terms and conditions for secured real estate loans of this type (a) including (i) customary covenants, terms, conditions and reserves and (ii) a partial release of Liens and security interests provision with respect to Reorganized OPD's redevelopment of the property whereby AFP will release and discharge its Liens or be deemed to have released and discharged its Liens on and security interests in unimproved parcel(s) or portions of the property selected to be subdivided and developed by the Reorganized OPD upon payment to AFP from or on behalf of Reorganized OPD of such amount to be set forth in the AFP Exit Documents, and (b) not including, among other things, (i) a lockbox arrangement, (ii) controls over Reorganized OPD's bank accounts, (iii) controls over expenditures and (iv) third-party guarantees, *provided*, *however*, that the Guaranty supporting the Indemnification Claims shall remain in effect, *provided*, *further*, that said Guaranty obligations shall be reduced and discharged as set forth in subsection (a)(ii) of this paragraph.

*(iv)*      *Voting*:  Class 1 is Impaired.  Therefore, Holder of Class 1 First Lien Debt Claim is entitled to vote to accept or reject the Plan.

*(v)*      *Projected Recovery:*  100%

**b.**      **Class 2 - General Unsecured Claims**

*(i)*      *Classification:*  Class 2 consists of all General Unsecured Claims (excluding Indemnification Claims and Other Unsecured Claims).

*(ii)*      *Treatment:*  Holders of Allowed General Unsecured Claims will receive, on or as soon as practicable after the Effective Date, in full and final satisfaction of the General Unsecured Claims, their *Pro Rata* share of $500,000 aggregate cash distribution.

*(iii)*      *Voting:*  Class 2 is Impaired.  Therefore, Holders of Class 2 General Unsecured Claims are entitled to vote to accept or reject the Plan.

*(iv)*      *Estimated Amount:*  $1.1 million.

*(v)*      *Projected Recovery:*  40%-60%

**c.**      **Class 3 - Other Unsecured Claims**

*(i)*      *Classification*:  Class 3 consists of all Other Unsecured Claims.

*(ii)*      *Allowance:*  *Holder of Other Unsecured Claim shall have its claim allowed pursuant to the Plan.*

*(iii)*      *Treatment:*  Holders of Other Unsecured Claims will not receive any distribution on account of such Claims and the Debtor and Reorganized Debtor shall be discharged, cancelled, released and extinguished from such Claims as of the Effective Date;  *provider*, *however*, that on the Effective Date the Other Unsecured Claims shall be transferred to and become the obligation of Tiburon, provided, further, that Tiburon's vote in favor of the Plan shall constitute Tiburon's assumption and acceptance of the Other Unsecured Claims.

*(iv)*      *Voting*:  Class 3 is Impaired and Holders of Class 3 Other Unsecured Claims are entitled to vote to accept or reject the Plan.

(v)     *Amount:*  $56,025,957.40.

(vi)    *Projected Recovery:*  Unknown/subject to return on Tiburon's retained equity interest.

**d.      Class 4 - Indemnification Claims**

(i)     *Classification*:  Class 4 consists of all Indemnification Claims.

(ii)    *Allowance*:  Class 4 Claims shall be Allowed for voting purposes pursuant to the Plan.

(iii)   *Treatment*:  In full and final satisfaction of an Indemnity Claim, the Holder's Indemnification Claim shall be reinstated against the Reorganized OPD to the extent that the Claim becomes Allowed, *provided*, *however*, that the Indemnification Claims shall be deemed expunged or reduced upon the Reorganized OPD's satisfaction of obligations underlying said Claims, including as set forth Class 1 hereof.

(iv)    *Voting*:  Class 4 is Impaired and Holders of Class 4 Indemnification Claims are entitled to vote to accept or reject the Plan.

(v)     *Projected Recovery:*  N/A

**e.      Class 5 – OPD Equity Interests**

(i)     *Classification*:  Class 5 consists of OPD Equity Interests.

(ii)    *Treatment*:  The Holder of OPD Equity Interests (Tiburon) will not receive any cash distribution on account of such Interest; *provided*, *however*, that in exchange for its assumption of Other Unsecured Claims and contributions to the Chapter 11 Case and the Plan, on the Effective Date, the Holder of OPD's Equity Interests will be restructured and diluted in accordance with the terms of the Fourth Amendment, the Fifth Amendment and the Capital Contribution Agreement.

(iii)   *Voting*:  Class 8 is Impaired. Holder of Class 6 OPD Equity Interests is entitled to vote to accept or reject the Plan.

(iv)    *Projected Recovery:*  Retention of 42.5% interest in Reorganized OPD.

**C.     ACCEPTANCE REQUIREMENTS**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired class of claims has accepted the applicable Plan if the Holders of at least two thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the applicable Plan.

**1.      Acceptance or Rejection of the Plan**

Classes 1, 2, 3, 4 and 5 of the Debtor are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  The Plan does not contain any classes that are deemed to have rejected or accepted the Plan pursuant to section 1126(g) and 1126(f) of the Bankruptcy Code, respectively.

2.        **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

D.        **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.        **Contribution of Equity Capital**

On or following the Effective Date, the Debtor will receive up to $7 million in equity and working capital pursuant to the Capital Contribution Agreement and the Fourth Amendment to the Operating Agreement.

2.        **Sources of Consideration for Plan Distributions**

All consideration necessary for the Reorganized Debtor to make payments or distributions pursuant hereto shall be obtained from the capital contributions as set forth in the Fourth Amendment and the Capital Contribution Agreement or other Cash from the Debtor, including Cash from business operations.

3.        **Cancellation of Loan Documents and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtor under the Prepetition Credit Facility, including the AFP Judgment, and any other share, note, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically reinstated pursuant to the Plan), shall be cancelled solely as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements or certificate or articles of incorporation or similar documents governing the shares, membership interests, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated pursuant to the Plan) shall be released and discharged.  In addition, as of the Effective Date, CW's employment by the Debtor shall continue pursuant to the Hotel Management Agreement included in the Plan Supplement, which shall supersede all prior agreements between CW, the Debtor and AFP entered into during the Chapter 11 Case.

4.        **Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Plan Securities contemplated by the Plan and all agreements incorporated herein, including the Fourth Amendment, the Fifth Amendment and the Capital Contribution Agreement, shall be exempt from, among other things, the registration requirements of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities.

5.        **Corporate Existence**

Except as otherwise provided herein, the Debtor shall continue to exist after the Effective Date as a separate limited liability company with all the powers of a limited liability company pursuant to the applicable law in the jurisdiction in which the Debtor is formed and pursuant to the Operating Agreement (or other formation documents) in effect before the Effective Date, except to the extent such Operating Agreement, including the Fourth Amendment and the Fifth Amendment, (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).

6.      **Post Effective Date Management**

The Debtor anticipates that the post-effective date management will not change except as set forth in the Fourth Amendment.  TCL New Jersey Corp will remain a manger of Reorganized OPD, and, pursuant to the Fourth Amendment to Operating Agreement, OP Management, LLC will become a co-equal manger.

7.      **Post Effective Date Members**

As set forth in the Capital Contribution Agreement and the Fourth and Fifth Amendment to the Operating Agreement, the Debtor anticipates that post-effective members of Reorganized OPD will be Tiburon Ocean Place LLC (42.5%), OPN or its designee or affiliate (42.5%), and Forest Lake Realty, LLC or its designee or affiliate (15%).

8.      **Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in Estate, all Causes of Action (except those released pursuant to the Releases by the Debtor), and any property acquired by any of the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

9.      **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

10.     **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the Capital Contribution Agreement and the Fifth Amendment; (2) the distribution of the Plan Securities as provided herein; and (3) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, members, managers, directors or officers of the Debtor or the Reorganized Debtor.

On or (as applicable) before the Effective Date, the appropriate members, managers and/or officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including the AFP Exit Documents, the Capital Contribution

Agreement and the Fifth Amendment, and any and all other agreements, documents, securities and instruments relating to the foregoing.

### 11.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor and the managers, officers and members thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 12.    Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

### 13.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtor provided by Article IX.B of the Plan), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtor or Reorganized Debtor has released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtor or otherwise), the Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise provided herein, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Debtor's Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired

Lease: (1) was assumed or rejected previously by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan Supplement, including any amendments before the Effective Date.

With respect to any Executory Contracts and Unexpired Leases to be assumed by the Debtor pursuant to Article VI.A of the Plan or otherwise, Cure Claims shall be satisfied, pursuant to section 365(b) of the Bankruptcy Code, by payment of the Cure Claims in Cash on the Effective Date or as soon as reasonably practicable thereafter or on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 2. Contracts and Leases Entered Into After the Petition Date

On and after the Effective Date, the Debtor may continue to perform under contracts and leases entered into after the Petition Date by the Debtor in the ordinary course of business, including any Executory Contracts and Unexpired Leases assumed by such Debtor.

### 3. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 4. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or the Reorganized Debtor, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

### 5. Rejection Claims Bar Date

**Notwithstanding anything herein to the contrary, any Creditor holding a Rejection Claim must File a Proof of Claim on account of such Claim with the Bankruptcy Court on or before the Rejection Claims Bar Date. All Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtor or the Reorganized Debtor, its Estate, and its property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX.E and Article IX.F of the Plan.**

### F.    PROVISIONS GOVERNING DISTRIBUTIONS

As of the Voting Deadline, the transfer register for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

All distributions under the Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Entity designated by the Reorganized Debtor as a Disbursing Agent on the Effective Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and the rights and powers of the Disbursing Agent are set forth in Article VII of the Plan.  In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtor.

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

The delivery of distributions, together with the treatment of minimum, undeliverable or unclaimed distributions are addressed in Article VII(F) of the Plan.

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

Article VII(H) of the Plan authorizes the Debtor and the Reorganized Debtor to withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, equity interests, rights, and Causes of Action that the Debtor or the Reorganized Debtor may possess against any such Holder, except as specifically provided in the Plan.

Article VII(I) sets forth the treat of Claims paid or payable by third parties, including the applicability of insurance policies to such Claims.

### G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

The Plan, including Article VIII, enables the Debtor or the Reorganized Debtor (on or after the Effective Date) to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan without approval of the Bankruptcy Court.  The Debtor reserves all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

Claims and Interests are Allowed only to the extent set forth in the Plan, including Article VIII.B. thereof. No payment or distribution provided under the Plan shall be made on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim and as set forth in Article VIII.C. of the Plan. Article VIII.E. of the Plan enables the Debtor or Reorganized Debtor (on or after the Effective Date) to request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously Filed with the Bankruptcy Court with respect to such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtor, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

The Plan provides that any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

### H.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable.

### 2.    Releases by the Debtor

**Article IX.B. of the Plan provides for customary releases by the Debtor of third parties defined in the Plan as the Released Parties.  Excepted from these releases are Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.**

### 3.    Releases by Holders of Claims and Interests

**Section IX.C. of the Plan provides for customary releases by Holders of Claims and Interests in favor of the Debtor, the Reorganized Debtor and the Released Parties.  Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence are excepted from the release.  The release set forth herein also does not apply to (i) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) the Guaranty**

Defendants in connection with the Claims set forth in the AFP Action and (iii) all defendants in the action commenced by the City of Long Branch marked as Docket No. MON-L-4604-08 with respect to the City Judgment entered in that action.   Furthermore, the Plan does not seek to release any Claims by the Untied States Government or state and local governments or any of their agencies.

### 4.    Exculpation

**Section IX.D. of the Plan contains a customary exculpation provision in favor of Exculpated Parties. As with the releases set forth herein, Exculpated Claims exclude any act or omission that is determined by a Final Order to have constituted gross negligence or willful misconduct.**

### 5.    Discharge of Claims and Termination of Interests

Article VIII.D of the Plan provides for the discharge of Claims against and termination of Interests in the Debtor as set forth in section 1141(d) of the Bankruptcy Code.

### 6.    Injunction

ARTICLE VIII.F OF THE PLAN SEEKS TO ENJOIN PARTIES FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.   AS SET FORTH IN THE PLAN, THE DEBTOR SEEKS TO ENJOIN AFP (INCLUDING ITS AFFILIATES, SUCCESSORS OR ASSIGNEES) FROM CONTINUING THE AFP ACTION, OR ANY VARIATION THEREOF, AGAINST THE GUARANTY DEFENDANTS FOR SO LONG AS THE REORGANIZED OPD IS IN MATERIAL COMPLIANCE WITH ITS OBLIGATIONS UNDER THE PLAN, INCLUDING THE AFP EXIT DOCUMENTS.

The injunction set forth in the Plan, including Article VIII.F thereof, is reasonable and required.  An injunction in favor of the Guaranty Defendants is necessary because the Plan provides for treatment of AFP's claims and any action against the Guaranty Defendants by AFP would be contrary to the provisions of the Plan.  In addition, absent the injunction, the Debtor would be unable to raise sufficient (if any) capital to exist from the Chapter 11 Case.  That the Guaranty Litigation is addressed by the Plan is a condition precedent to funding under the Capital Contribution Agreement.  Moreover, certain of the beneficiaries of the injunction are necessary to the Reorganized Debtor's ability to reorganize and operate post the Effective Date.  Certain of the Guaranty Defendants were also instrumental in securing the Debtor's post-petition financing, compliance with the budget during the pendency of this Chapter 11 Case, and have significantly aided in the formulation and negotiation of the Plan and this Disclosure Statement and the Ballot.  These parties, along with the Debtor's representatives, have all made substantial contributions to the Debtor's restructuring efforts and would not have made such contribution without the foregoing protections.

### 7.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.    Setoff and Recoupment

**Except with respect to Claims or payments allowed in or provided for under the Plan, the Debtor may setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant, but the failure to do so shall not constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim it may have against such claimant.**

9.      **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, judgments, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, judgments or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  Notwithstanding the foregoing, on the Effective Date and as more fully set forth in the AFP Exit Documents, AFP shall be granted new Liens on and security interests in substantially all of the Reorganized OPD's assets.

I.      **CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.  Article X.B. of the Plan contains various conditions precedent to the Effective Date.  It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C. of the Plan.  The Effective Date shall be the date on which the Confirmation Order becomes a Final Order; *provided*, *however*, the conditions specified in Article X.B. have been satisfied or waived.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders, or any other Entity in any respect.

J.      **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

Subject to Article XI of the Plan, the Debtor reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.  The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date.

K.      **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and all matters, arising out of, or related to, the Chapter 11 Case and the Plan, as more fully set forth in Article XII of the Plan.

L.      **MISCELLANEOUS PROVISIONS**

Article XIII of the Plan contains various miscellaneous provisions, including provisions related to the binding effect of the Plan and the Plan Supplement, the filing and service of documents before and after the Effective Date, a reservation of rights by the Debtor, the severability of Plan provisions, incorporation of exhibits and Plan Supplement into the Plan, solicitation of votes, closing of Chapter 11 Case and resolution of conflicts.

X.      **PROJECTED FINANCIAL INFORMATION**

The Debtor has attached its projected financial information as **Exhibit B** to this Disclosure Statement.  The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan.  In connection with the development of the Plan and for the purposes of

determining whether the Plan satisfies this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.  Management prepared financial projections (the "**Projections**") for the period from 2011 through 2014 (the "**Projection Period**").

The Debtor does not publish its business plans or strategies, projections or anticipated financial position. Accordingly, the Debtor does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtor to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were prepared in June 2011.  The Debtor is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtor's prospects.

The Debtor's management did not prepare such projections to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission.  The Debtor's accountants have neither examined nor compiled the projections that accompany the disclosure statement and, accordingly, do not express an opinion or any other form of assurance with respect to the projections.  Except for purposes of the Disclosure Statement, the Debtor does not publish projections of its anticipated financial position or results of operations.

Moreover, the projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the debtor.  Actual results or developments may differ from the expectations expressed or implied in the forward-looking statements, and the Debtor undertakes no obligation to update any such statements.  The projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  In deciding whether to vote to accept or reject the plan, Holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections and should consult with their own advisors.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.    RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan.  Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.*

## A.    RISKS RELATING TO BANKRUPTCY

**(i)**        The Debtor may not be able to obtain confirmation of the Plan.

To emerge successfully from chapter 11 as a viable entity, the Debtor, like any debtor, must obtain approval of a plan of reorganization from its creditors and confirmation of the Plan through the Bankruptcy Court and must successfully implement the Plan.  The foregoing process requires the Debtor to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan, (b) solicit and obtain creditor acceptances of the proposed plan and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the Debtor may not receive the requisite acceptances to confirm a plan. If the requisite acceptances of the Plan are received, the Debtor intends to seek Confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances are not received, the Debtor may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class of Claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting Class, the Bankruptcy Court also must find that at least one impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed.  A dissenting Holder of a Claim against the Debtor could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.  Finally, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) the Debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, (b) confirmation of the Debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization and (c) the value of distributions to non-accepting Holders of Claims within a particular Class under the Debtor's plan will not be less than the value of distributions such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Bankruptcy Court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by the Bankruptcy Court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor would be able to reorganize its business and what, if any, distributions Holders of Claims ultimately would receive with respect to their Claims.  There also can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the Debtor's creditors and other parties in interest.  Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusivity period during which only the Debtor may propose and confirm a plan of reorganization. Finally, the Debtor's emergence from bankruptcy is not assured. While the Debtor expects to emerge from bankruptcy in the future, there can be no assurance that the Debtor will successfully reorganize or when this reorganization will occur.

**(ii)**        The Conditions Precedent to the Effective Date of the Plan may not occur.

As more fully set forth in the Plan, which is attached hereto as **Exhibit A**, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

**(iii)**        Historical Financial Information of the Debtor may not be comparable to the Financial Information of the Reorganized Debtor.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be

comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

(iv)      The Debtor may object to the amount or classification of a Claim.

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

## B.      RISKS RELATED TO FINANCIAL INFORMATION

The financial information is based on the Debtor's books and records and, unless otherwise stated, no audit was performed.  This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the financial projections.  Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the Reorganized Debtor's ability to maintain or increase revenues and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtor's ability to maintain the loyalty of its current patrons and prospective patrons.

The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

No legal or tax advice is provided by this disclosure statement.  This Disclosure Statement is not legal advice to any person.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, Holders of Allowed Claims, Interests or any other parties in interest.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtor or the Reorganized Debtor may seek to investigate, File and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or objections to Claims.

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

No representations concerning or relating to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as

contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtor and the Office of the United States Trustee for the District of New Jersey.

## XII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in Classes 1, 2, 3, 4 and 5.  Only the Holders of Claims and Interests in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided.

Lowenstein Sandler PC, the Debtor's restructuring counsel, will serve as the Voting Agent.  The Voting Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

**The deadline to vote on the Plan is 5:00 p.m., (prevailing Eastern Time), on _____, 2011.**

---

**BALLOTS**

Ballots must be actually received by the Voting Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on _____, 2011 at the following address:

**Lowenstein Sandler PC**
**Attn: Lisa Bonito**
*OPD Balloting*
**65 Livingston Avenue**
**Roseland, NJ 07068**

If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number:

**1-973-597-2500**

---

**MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS AND INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN.  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED AND RECEIVED BY 5:00 P.M. (EASTERN TIME), ON _____, 2011.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MAY CAST ONLY ONE BALLOT PER EACH CLAIM.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 1, 2, 3, 4 AND INTEREST IN CLASS 5 WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO THE CLAIM OR INTEREST HAS BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO THE CLASS OF CLAIMS OR INTERESTS, THE EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.**

**XIII.    CONFIRMATION OF THE PLAN**

    **A.    THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan of Reorganization. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____ ____, 2011 at __:__ __.m. (prevailing Eastern Time) before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of New Jersey, located at Clarkson S. Fisher US Courthouse, 402 East State Street, Trenton, NJ 08608. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

    **B.    DEADLINE TO OBJECT TO CONFIRMATION**

Objections to the Bankruptcy Court's Confirmation of the Plan, including to the proposed assumption of executory contracts and unexpired leases and proposed cure amounts set forth in the Plan Supplement, must be filed and served at or before 5:00 p.m. prevailing Eastern Time on ____ __, 2011. **Unless objections to Confirmation are timely served and Filed, they may not be considered by the Bankruptcy Court.**

    **C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims and Interests, or if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (2) is feasible, and (3) is in the "best interests" of Holders of Claims and Interests that are impaired under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (2) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

### D.       BEST INTERESTS OF CREDITORS/LIQUIDATION ANALYSIS

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each Class, that each Holder of a Claim or an Equity Interest in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Debtor's chapter 11 case was converted to a chapter 7 case and the assets of such Debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or an Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the Holder's liquidation distribution to the distribution under the Plan that the Holder would receive if the Plan were confirmed and consummated.

To estimate what members of each impaired Class of Claims would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to Holders of Claims would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (c) unpaid administrative expense Claims of the Chapter 11 Case; and (d) priority Claims and priority tax Claims.  The Debtor's costs of liquidation in chapter 7 cases would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the operation of the Debtor during the chapter 7 cases, and all unpaid administrative expense Claims incurred by the Debtor during the Chapter 11 Case that are allowed in the chapter 7 cases.  The liquidation itself would trigger certain priority Claims and would likely accelerate the payment of other priority Claims and priority tax Claims that would otherwise be payable in the ordinary course of business.  These priority Claims and priority tax Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests.

Based on the liquidation analyses set forth in **Exhibit D** of this Disclosure Statement, the Debtor believes that Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation.  Moreover, in an actual liquidation of the Debtor, distributions to Holders of Claims would be made substantially later than the Effective Date designated in the Plan.  The hypothetical chapter 7 liquidations of the Debtors, for purposes of determination of the Debtor's Liquidation Value, are assumed to commence on June 30, 2011 or as otherwise indicated in Exhibit D.

In summary, the Debtor and its management believe that a chapter 7 liquidation of the Debtor would result in substantial diminution in the value to be realized by Holders of Claims entitled to distributions, as compared to the distributions contemplated under the Plan, because of, among other factors:

- the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation in connection with the cessation of the Debtor's operations;

- the erosion of the value of the Debtor's assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

- the adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors;

- the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Chapter 11 Case; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtor and its management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7.

If the Plan is not confirmed, and the Debtor fails to propose and confirm an alternative plan of reorganization, it may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtor's assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 plan of liquidation probably would be delayed substantially. Most importantly, the Debtor believes that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of its business. Accordingly, the Debtor believes that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### E.    FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtor has analyzed its ability to meet its respective obligations under the Plan. As part of this analysis, the Debtor has prepared the Projections, as set forth on **Exhibit B**. Based upon the Projections, the Debtor believes that OPD will be a viable operation following the Chapter 11 Case and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### F.    ACCEPTANCE BY IMPAIRED CLASSES

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is impaired under a plan, accept the Plan. A Class that is not "impaired" under a plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances with respect to the Class is not required. A Class is "impaired" unless the Plan: (a) leaves unaltered the legal, equitable and contractual rights to which the Claim or the Equity Interest entitles the Holder of the Claim or Equity Interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the Holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such Claim or Equity Interest entitles the Holder of such Claim or Equity Interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed Claims in that Class, counting only those Claims that actually voted to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a Class of impaired Equity Interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by Equity Interest Holders that hold at least two-thirds in amount of the allowed Equity Interests of such Class, counting only those Equity Interests that actually voted to accept or reject the Plan. Thus, a Class of Equity Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### G.    CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired Classes have not accepted it, provided that the Plan has been accepted by at least one impaired Class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Plan proponent's request, in a procedure commonly known as "cramdown," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### H.    NO UNFAIR DISCRIMINATION

Often referred to as the "vertical test," this test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (e.g., Classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two Classes of unsecured creditors differently without unfairly discriminating against either Class.

### I.    FAIR AND EQUITABLE TEST

Often referred to as the "horizontal test," this test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the allowed Claims in such Class. As to the dissenting Class, the test sets different standards depending upon the type of Claims or Equity Interests in such Class.

**(i)**    Secured Claims:

The condition that a plan be "fair and equitable" to a non-accepting Class of secured Claims includes the requirements that: (1) the Holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan; and (2) each Holder of a secured Claim in the Class receives deferred cash payments totaling at least the allowed amount of such Claim with a value, as of the effective date of the Plan, at least equivalent to the value of the secured claimant's interest in the Debtor's property subject to the liens.

**(ii)**    Unsecured Claims:

The condition that a plan be "fair and equitable" to a non-accepting Class of unsecured Claims includes the requirement that either: (1) the Plan provides that each Holder of a Claim of such Class receive or retain on account of such claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or (2) the Holder of any Claim or any Equity Interest that is junior to the claims of such Class will not receive or retain under the Plan on account of such junior claim or junior Equity Interest any property, subject to the applicability of the "new value" exception.

**(iii)**    Equity Interests:

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either:  (1) the Plan provides that each Holder of an Equity Interest in that Class receives or retains under the Plan on account of that Equity Interest property of a value, as of the effective date of the Plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such Holder is entitled; (b) any fixed redemption price to which such Holder is entitled; or (c) the value of such interest; or (2) if the Class does not receive the amount as required under (1) hereof, no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the Plan.

If any impaired Class rejects the Plan, the Debtor reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule prior to confirmation of the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The Debtor submits that if the Debtor's "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## J.    VALUATION OF THE DEBTOR

The Debtor believes that its going-concern value is between $60 million and $65 million, for a midpoint of $62.5 million.  To the extent necessary, the Debtor reserves the right to appraise its property.

The Debtor also intends to spend approximately $3.5 million on capital improvements within the eighteen months immediately following the Effective Date.  The repairs and upgrades to the resort premises will ensure that OPD continues to provide first-rate services for its guests and patrons and remains the resort of choice in the years to come. A detailed analysis of the projected investments is set forth in the Capital Investment Listing annexed hereto as **Exhibit C**.

The estimates of value represent hypothetical total enterprise values of the Reorganized Debtor as the continuing operators of the business and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  The value of an operating business such as the Debtor's business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.

## XIV.    CERTAIN SECURITIES LAW MATTERS

### A.    PLAN SECURITIES

The Plan provides for Tiburon Ocean Place LLC to retain a portion of its membership interest in Reorganized OPD.  The Plan also provides that other Entities will become equity holders in Reorganized OPD through membership interests in Reorganized OPD.  These membership interests may constitute "securities" as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law. The Debtor further believes that the offer and sale of the Plan securities pursuant to the Plan are, and subsequent transfers of the Plan securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

B.       ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon this exemption, the offer and sale of the Plan securities will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan securities may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the Plan securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Plan securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law.

XV.    RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtor recommends that Holders of Claims and Interests entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated:  July 17, 2011

Respectfully submitted,

OCEAN PLACE DEVELOPMENT LLC

By: /s/ William R. Dixon, Jr.
    By: William R. Dixon, Jr.
    Vice-President of TCL New Jersey Corp., Manager of
    Ocean Place Development LLC

Prepared by:

Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Wojciech F. Jung, Esq.
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Attorneys for the Debtor and Debtor in Possession*