RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Joseph L. Schwartz, Esq. (JS-5525)
Kevin J. Larner, Esq. (KL-8627)
Headquarters Plaza,
One Speedwell Avenue
Morristown, New Jersey  07962-1981
(973) 538-0800

Attorneys for AFP 104 Corp.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| OCEAN PLACE DEVELOPMENT, LLC, | Case No. 11-14295 (MBK) |
| Debtor. | |

**OBJECTION OF AFP 104 CORP. TO APPROVAL OF DISCLOSURE
STATEMENT FOR THE DEBTOR'S PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

AFP 104 Corp. ("AFP"), by and through its undersigned counsel, hereby submits

the within Objection to the Disclosure Statement (the "Disclosure Statement") for the Plan of

Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") proposed by the

Debtor, Ocean Place Development, LLC (the "Debtor").   In support of the Objection, AFP

respectfully represents as follows:

**PRELIMINARY STATEMENT**

After filing its bankruptcy petition in an effort to stave off AFP's pending foreclosure

sale, the Debtor now files its Disclosure Statement with respect to its Plan, which Plan is filed in

bad faith in a strategic attempt to cram down AFP for the benefit of the Debtor's insiders.

The Plan, on its face, contains many improper provisions and violates numerous provisions of the Bankruptcy Code, thereby making the Plan patently unconfirmable as a matter of law.  As is set forth herein, the Plan is patently unconfirmable because, *inter alia*, the Plan (i) violates the absolute priority rule by seeking to allow current equity to maintain its equity in the reorganized debtor; (ii) grants illegal broad releases and injunctions in favor of the Debtor's insiders; (iii) blatantly gerrymanders classes of claims in an improper attempt to obtain an impaired accepting class, in disregard of controlling law; (iv) improperly treats AFP's claim, both in terms of payment terms that fail to comply with the Bankruptcy Code, as well as with respect to improperly modifying AFP's existing non-monetary protections, without providing AFP with any indubitable equivalent or other compensation; and (v) lacks feasibility, as the Plan is premised, among other things, upon a speculative future sale or refinance of the Debtor's hotel to satisfy the Debtor's payment obligations to AFP under the Plan.  For these and many other reasons, the Plan is patently unconfirmable as a matter of law, and therefore the Disclosure Statement should not be approved.

Not only is the Debtor's Plan patently unconfirmable as a matter of law, but the Disclosure Statement is woefully deficient in many respects in that it is both misleading and because it fails to provide necessary and adequate information that is required by 11 U.S.C. § 1125.  For this additional reason, the Court should not approve the Disclosure Statement.

**BACKGROUND**

**A.**     **The Debtor's Bankruptcy Filing.**

1.      To stave off and delay a foreclosure sale of its real property, on February 15, 2011 (the "Petition Date"), the Debtor, which has relatively few creditors other than AFP and some trade payables that had not yet been paid in the ordinary course, filed a voluntary Chapter 11 petition for relief with this Court.

2.    Since the Petition Date, the Debtor has continued to operate its business and manage its affairs as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.    As a result of the fact that the Debtor has few creditors and due to lack of interest by the Debtor's unsecured creditors, no official unsecured creditors' committee was appointed in this chapter 11 case.

4.    The Debtor owns and operates one asset, the Ocean Place Resort & Spa, which is a 254-room hotel located on approximately 17 acres in Long Branch, New Jersey (collectively, the "Hotel").

**B.    The Debtor's Indebtedness to AFP.**

5.    As of the Petition Date, the Debtor owed AFP $57,245,372.26, plus attorneys' fees and costs, which claim is secured by a first priority lien on all the Debtor's assets, including the Hotel.

6.    The Debtor's obligations to AFP arise from certain loans (the "Loan") made to the Debtor by AFP's predecessor in interest, Barclays Capital Real Estate, Inc. ("Barclays"), which Loan was memorialized by a loan agreement dated as of April 25, 2006, as amended on December 27, 2006, between the Debtor, as borrower, and Barclays, as lender (the "Loan Agreement").

7.    To memorialize its obligations under the Loan Agreement, the Debtor executed two (2) separate promissory notes in favor of Barclays, in the original principal amounts of $44,000,000 and $8,875,000 (collectively, the "Notes").

8.    To secure repayment of all amounts due under the Notes, the Debtor granted Barclays a first priority mortgage and first priority liens on all the Debtor's assets, as reflected in a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of April 3, 2007, and effective as of April 25, 2006 ("Mortgage 1"); a Mortgage, Assignment of

Rents and Leases, Security Agreement and Fixture Filing dated as of March 30, 2007 ("Mortgage 2"); and a First Amendment to Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of March 2007 ("this amendment, collectively with Mortgage 1 and Mortgage 2, the "Mortgages").

9.      Barclays properly perfected its liens and security interests by properly filing and recording the appropriate documents.

10.     To further secure the Debtor's obligations under the Notes, certain of the Debtor's principals provided Barclays with unconditional personal guarantees with respect to the Debtor's indebtedness under the Notes. Specifically, William R. Dixon, Jr. ("Dixon"), one of the Debtor's principals; Tiburon Ocean Place, LLC ("Tiburon"), the Debtor's 100% equity holder; Tiburon Capital LLC; David L. Orr; and Orr Partners LLC (collectively, the "Guarantors") each provided Barclays with unconditional guarantees of the Debtor's obligations, which are now due and owing to AFP.

11.     In connection with the aforementioned guarantees, the Guarantors also executed and delivered to Barclays an Environmental Indemnity Agreement dated as of April 25, 2006, pursuant to which the Guarantors agreed to jointly and severally indemnify, defend, release and hold harmless the "Indemnified Parties" (as defined therein) from and against certain "Losses" arising out of or relating to, among other things, the presence of certain hazardous materials at the Hotel. This was the result of the Debtor's acknowledgement of the presence of certain hazardous materials associated with historic gas plant operations that had been performed at the property prior to the construction of the Hotel, which had not been remediated.

**C.**     **The Foreclosure Judgment.**

12.     The Loan matured <u>more than three (3) years before the Petition Date</u>, on January 9, 2008, which the Debtor failed to repay, causing a default by the Debtor under the relevant Loan documents.

13.     After the Loan matured, for more than three (3) years, the Debtor attempted, without success, to refinance the Loan.

14.     As a result of the Debtor's default, on or about October 3, 2008, Barclays commenced a foreclosure action against the Debtor's Hotel in the Superior Court of New Jersey, which after approximately two years resulted in the entry of judgment on or about August 12, 2010 in favor of Barclays in the amount of $53,205,117.94, plus interest (the "<u>Foreclosure Judgment</u>").

15.     Shortly after entry of the Foreclosure Judgment, on or about October 26, 2010, AFP purchased from Barclays and took by way of assignment all of Barclays' rights and interests under the Loan Agreement, Notes and Mortgages    (collectively, the "<u>Loan Documents</u>").

16.     Thereafter, the Monmouth County Sheriff scheduled a foreclosure sale of the Hotel for January 24, 2011.  After the Debtor again delayed by exercising its two statutory adjournments of the foreclosure sale, causing the foreclosure sale to be adjourned to February 22, 2011, the Debtor filed its Chapter 11 bankruptcy petition, again for the purpose of delaying and frustrating AFP's efforts to foreclose against the Hotel.

**D.**     **The Guarantee Action.**

17.     On or about February 18, 2011, AFP commenced a lawsuit in the Supreme Court of the State of New York, County of New York (the "<u>New York State Court</u>") against the Guarantors, which action bears Index No. 650436/2011 (the "<u>Guarantee Action</u>").

18.    On or about June 29, 2011, AFP filed a motion for summary judgment in the

Guaranty Action. The Guarantors' opposition to AFP's summary judgment motion is due on

August 10, 2011, and the hearing on AFP's summary judgment motion is scheduled for August

25, 2011.

**E.**    **The Plan and Disclosure Statement.**

19.    On or about July 17, 2011, and in an effort to stave off AFP's motion for relief

from the automatic stay, the Debtor filed the Plan and Disclosure Statement with the Court.

## SUMMARY OF THE PLAN

20.    The salient terms of the Plan are summarized below:

- The Plan creates five (5) classes of claims and interests, including three (3) separate classes of purported unsecured creditors. The Plan proposes that each class of claims is entitled to vote, despite the fact that certain classes are either unimpaired or are not receiving any distributions under the Plan.

- Despite the fact that AFP holds a claim in excess of $57 million, the Plan proposes to allow AFP's claim against the Debtor in the amount of $52,252,801.26 (the "Allowed AFP Claim"). The Debtor proposes to pay AFP the sum of $5 million on the Effective Date[1] on account of the Allowed AFP Claim and proposes to issue a new note (the "New Note") to AFP for the balance of the outstanding Allowed AFP Claim. The New Note is to be paid under the Plan over a period of seven (7) years, with only four percent (4%) annualized interest. Further, the Debtor proposes to pay AFP interest only during the first year of the Plan, and therefore proposes to pay AFP principal and interest in accordance with varying amortization schedules.

- At the end of the seventh (7th) year, the Plan provides that the Debtor will make a lump sum balloon payment to AFP in the then outstanding principal balance, plus an exit fee of 1% of the outstanding principal amount of the New Note then payable. The Plan and the Disclosure Statement, however, fail to provide any details concerning the balloon payment, including failing to discuss how the Debtor intends to fund the required balloon payment.

- The Plan also improperly provides that the AFP Exit Documents will require AFP to release a portion of its Liens with respect to certain of the Debtor's real property.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

- The Plan further seeks to strip AFP of certain of its non-monetary protections under its Notes and Mortgages, without compensation to AFP. These protections that the Debtor seeks to strip AFP of, include, but are not limited to: (i) the lockbox arrangement currently in place, (ii) the ability to review and approve expenditures, (iii) financial controls with respect to the Reorganized Debtor's bank accounts, and (iv) third-party guarantees.

- Despite the fact that AFP's rights are to be affected under the Plan, the Debtor fails to attach the AFP Exit Documents to the Disclosure Statement. Instead, the Plan states that the Debtor will file the AFP Exit Documents with the Court ten (10) days prior to the voting deadline with respect to the Plan. As a result, the details with respect to the Debtor's treatment of the AFP Allowed Claim are neither included in the Disclosure Statement nor are they disclosed to AFP.

- The Plan proposes to pay the other classes of creditors as follows:

    (i)     Class 2 - General Unsecured Creditors will receive a pro-rata share of $500,000;

    (ii)    Class 3 - Other Unsecured Claims, which class consists of the claims of certain insiders and others related to Tiburon, the Debtor's 100% equity owner, for amounts purportedly loaned to the Debtor, will receive no distribution under the Plan, and their claims will be forever discharged as to the Debtor; and

    (iii)   Class 4 - Indemnification Claims, which are the claims of AFP's guarantors, most of whom are insiders, who supposedly have claims against the Debtor for indemnity, will be reinstated in full against the Reorganized Debtor.

- The Plan will be funded, in part, by capital infusions of up to $7 million from two entities: OPN Acquisitions, LLC ("OPN") and Forest Lake Realty, LLC ("Forest Lake"). In return for these investments, OPN and Forest Lake are to receive a combined 57.5% equity interest in the Reorganized Debtor.

- Class 5 - OPD Equity Interests, consists of the equity interest of Tiburon, the current 100% equity owner of the Debtor. Notwithstanding the fact that creditors senior to equity are not being paid in full under the Plan, the Plan improperly proposes that Tiburon will retain a 42.5% equity interest in the Reorganized Debtor on account of its equity interests in the Debtor.

- The Plan also proposes to improperly grant broad blanket releases running from non-debtor parties to other non-debtor parties, including releases by AFP to the Guarantors. Rather than make these broad releases explicit, the Debtor chooses to hide them. Specifically, the Plan proposes (i) that the Loan Documents will be cancelled and discharged on the Effective Date, (ii) that the New Note that is to be issued will have no guarantees and (iii) that AFP will be enjoined from prosecuting

7

the Guarantee Action after the Effective Date. Because the Debtor's obligations to AFP after the Effective Date will stem only from the New Note, and because all of the Debtor's obligations under the Loan Documents will be deemed cancelled and discharged by virtue of the Plan, the Plan effectively causes a full release of all of the Guarantors.

## SUMMARY OF OBJECTION

21.     For the reasons set forth herein, the disclosures contained in the Disclosure Statement are grossly inadequate, resulting in the Disclosure Statement lacking adequate information and preventing creditors from possibly making an informed decision with respect to the Plan. For example, the Disclosure Statement should not be approved because, among other things, it:

(i)     provides incomplete and inadequate information regarding the treatment of the AFP Allowed Claim and the AFP Exit Documents;

(ii)    provides inaccurate and misleading information about the ability of certain classes of claims to vote with respect to the Plan;

(iii)   provides misleading and incomplete financial data and projections;

(iv)    provides inadequate information regarding the proposed owners of the Reorganized Debtor and the proposed managers of the Reorganized Debtor;

(v)     provides inadequate information regarding the funding for the Plan;

(vi)    provides inadequate information regarding the Debtor's valuation of its assets;

(vii)   provides inadequate, misleading information regarding the releases and injunctions provided for by the Plan;

(viii)  fails to adequately disclose the speculative nature of the Plan and the many risks associated with the Plan; and

(ix)    contains various other material misstatements and/or omissions.

22.     Furthermore, the Disclosure Statement should not be approved because the Plan itself is patently unconfirmable as a matter of law. Specifically, among other things, the Plan:

(i)     improperly establishes multiple classes of unsecured claims in an attempt to gerrymander an impaired accepting class, in violation of 11 U.S.C. §§ 1122 and 1129(a)(1) and established Third Circuit law;

(ii)    improperly entitles certain classes of claims to vote with respect to the Plan, in violation of 11 U.S.C. §§ 1126 and 1129(a)(1);

(iii)   violates the absolute priority rule by providing Tiburon with an ownership interest in the Reorganized Debtor in exchange for no new value, and without any market test, in disregard of established law;

(iv)    cannot satisfy the cramdown requirements 11 U.S.C. § 1129(b)(2)(A) with respect to the treatment of the Allowed AFP Claim, and therefore cannot be approved by the Court over AFP's objection;

(v)     contains improper and illegal releases to non-debtor parties, in violation of 11 U.S.C. § 524(g) and established Third Circuit law;

(vi)    violates 11 U.S.C. § 1129(a)(3) because the Plan was not proposed in good faith;

(vii)   violates 11 U.S.C. § 1129(a)(5) because the Plan (a) fails to adequately disclose the identity of post-confirmation management; (b) fails to disclose the identity and nature of compensation of any insiders who will be employed by the Reorganized Debtor; and (c) cannot establish that public policy and the best interests of creditors will be served by post-confirmation management;

(viii)  violates 11 U.S.C. § 1129(a)(7) because the Plan is not in the best interests of creditors; and

(ix)    violates 11 U.S.C. § 1129(a)(11) because the Plan is speculative and not feasible.

## OBJECTION

I.      **THE DISCLOSURE STATEMENT DOES NOT PROVIDE ADEQUATE INFORMATION AND SHOULD NOT BE APPROVED BECAUSE IT OMITS AND MISREPRESENTS INFORMATION THAT IS NECESSARY FOR A REASONABLE INVESTOR TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.**

A.      **Legal Standard.**

23.     Section 1125(b) of the Bankruptcy Code requires a disclosure statement to provide adequate information to creditors:

> An acceptance or rejection of a plan may not be solicited after
> commencement of the case under this title from a holder of a claim
> or interest . . . unless, at the time of or before such solicitation,
> there is transmitted to such holder the plan or a summary of the
> plan, and a written disclosure statement, approved, after notice and
> a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b) (emphasis added).

24.    "Adequate information" is reviewed in terms of the information a reasonable

investor would need to make an informed judgment on the Plan:

> '[A]dequate information' means information of a kind, and in
> sufficient detail, as far as is reasonably practicable in light of the
> nature and history of the debtor and the conditions of the debtor's
> books and records, that would enable a hypothetical reasonable
> investor typical of holders of claims or interests of the relevant
> class to make an informed judgment about the plan.

11 U.S.C. § 1125(a).  The Third Circuit Court of Appeals has stressed the importance of full

disclosure by stating:

> [W]e cannot overemphasize the debtor's obligation to provide
> sufficient data to satisfy the Code standard of 'adequate
> information.'

Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.), 848 F.2d

414, 417 (3d Cir. 1988).  See also Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d

869, 873 (2d Cir. 1991) ("11 U.S.C. § 1125(b) requires Chapter 11 petitioners to file a

mandatory disclosure statement listing all 'adequate information' which would enable holders of

claims to take an informed position on a proposed reorganization plan.").

25.    Additionally, "the plan, which is being described, [must] have sufficient depth so

that the disclosure statement provides the 'hypothetical investor' with the kind of information to

evaluate the risk of acceptance of the plan[;] [o]therwise, a detailed disclosure of a deceptive

plan might survive a disclosure statement hearing, and that was not the intent of Congress." In re

New Haven Radio, Inc., 18 B.R. 977, 979 (Bankr. D. Conn. 1982).

26.     Courts have defined a "reasonable investor" as "[a]n investor typical of the class is one having such a relationship with the debtor as other holders generally have and having such ability to obtain information from sources other than the disclosure statement as other holders of claims in the class have." In re Weiss-Wolf, Inc., 59 B.R. 653, 654 (Bankr. S.D.N.Y. 1986).

27.     A determination of whether a disclosure statement contains "adequate information" is within the discretion of the bankruptcy court and must be determined on a case-by-case basis.  See Oneida Motor Freight, Inc., 848 F.2d at 417; In re Phoenix Petroleum Co., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 179 B.R. 24, 29 (S.D.N.Y. 1995).

28.     Although the term "adequate information" is not specifically defined, courts have set forth a non-exclusive list of the type of information that should be included, including:

- The circumstances that gave rise to the filing of the bankruptcy petition;

- A complete description of the available assets and their value;

- The anticipated future of the debtor;

- The source of the information provided in the disclosure statement;

- The condition and performance of the debtor while in Chapter 11;

- Information regarding claims against the estate;

- A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

- The accounting and valuation methods used to produce the financial information in the disclosure statement;

- Information regarding the future management of the debtor, including the amount of compensation to be paid to any insider, directors, and/or officers of the debtor;

- A summary of the plan of reorganization;

- The collectibility of any accounts receivable;

- Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

- Information relevant to the risks being taken by the creditors;

- The actual or projected value that can be obtained from avoidance actions;

- The existence, likelihood and possible sources of non-bankruptcy litigation; and

- The relationship of the debtor with any affiliates.

In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (quoting In re Scioto Valley Mortgage Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988)). See also In re U.S. Brass Corp., 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

29.    Additionally, statements of mere opinion or belief are inadequate without accompanying factual support. In re Beltrami Enters., 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (conclusory allegations or opinions without supporting facts are generally not acceptable); In re Ferretti, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) (statement that projection of restaurant's income and expenses was virtually impossible to provide but that debtor believed plan to be feasible based on experience was inadequate); In re Egan, 33 B.R. 672, 676 (Bankr. N.D. Ill. 1983) (debtor's disclosure statement failed to provide adequate information where rehabilitation plan was founded solely upon bare assertions of opinion without supporting facts); In re E. Redley Corp., 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) (conclusory opinion of value is insufficient where value of assets is significant to plan).

30.    Here, as is forth below, it is readily apparent that the Disclosure Statement does not contain adequate information, does not comply with the Bankruptcy Code, and therefore cannot be approved.

**B.** **The Disclosure Statement Provides Inadequate Information Regarding the Treatment of the AFP Allowed Claim, Including the Terms that Will be Contained in the AFP Exit Documents.**

31.    One of the hallmarks of an adequate disclosure statement is that it provides creditors with all of the information necessary for those creditors to determine how their claims are proposed to be treated under the proposed plan. See, e.g., In re J.D. Mfg., Inc., 2008 WL 4533690, at *2 (Bankr. S.D. Tex. 2008); In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

32.    Here, with respect to the proposed treatment of the AFP Allowed Claim, the Debtor's Disclosure Statement fails to even provide this most basic information.  Specifically, although the Plan proposes to make payments over time to AFP, first of interest only, then pursuant to different amortization schedules, culminating with a balloon payment to AFP at the end of seven (7) years, the Disclosure Statement both fails to describe why the Debtor proposes to pay AFP in this manner and fails to describe how the balloon payment will be made.

33.    The Disclosure Statement also fails to provide any of the details with respect to the terms of the agreements that the Debtor is attempting to force AFP to enter into through the Plan.  Instead, the Disclosure Statement simply states that these details will be disclosed by the Debtor only when it files the AFP Exit Documents with the Plan Supplement -- *after the hearing with respect to the approval of the Disclosure Statement* and a mere ten (10) days prior to the voting deadline with respect to the Plan.

34.    Further, the Disclosure Statement vaguely states that the AFP Exit Documents will "contain standard terms and conditions for secured real estate loans of this type." (Disclosure Statement at 22).  However, at the same time, the Debtor seeks to unilaterally strip AFP of standard protections that the Debtor entered into with Barclays that the Debtor apparently now finds unfavorable.

35.    The new lending terms proposed by the Debtor must be disclosed prior to the approval of the Disclosure Statement for AFP and other parties in interest to have adequate information, as is required by 11 U.S.C. § 1125.

36.    For these reasons, the Disclosure Statement cannot be approved.

**C.    The Disclosure Statement Provides Misleading and Inadequate Financial Information Regarding the Debtor and its Ability to Effectuate the Plan.**

37.    One of the key elements to a disclosure statement is that it provides sufficient financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan. See, e.g., In re Cardinal Congregate I, 121 B.R. at 765.

38.    Here, the Disclosure Statement's pro forma projections and its Liquidation Analysis are flawed and do not provide adequate information to satisfy 11 U.S.C. § 1125.

39.    The Plan provides that the Debtor will be required to make payments to AFP on account of the New Note for a seven (7) year period, pursuant to varying amortization schedules. Assuming, as the Debtor does, that the Plan will be effective as of October 1, 2011, this means that Plan payments will have to be made by the Reorganized Debtor through and including October 2018.   Notwithstanding this fact, the Debtor only provides pro-forma projections through 2014. (See Disclosure Statement, Ex. B). This leaves AFP and other parties in interest to merely guess as to the Debtor's ability to effectuate the required payment under the Plan in the years 2015 through 2018.   This alone makes Disclosure Statement incapable of being approved under 11 U.S.C. § 1125. See In re Tavern Motor Inn, Inc., 56 B.R. 449, 455 (Bankr. D. Vt. 1985) ("Neither the Court nor creditors should have to perform acrobatic feats of financial analysis in order to make an informed judgment about a proposed plan. Nor should a creditor have to wait until an evidentiary hearing to learn that statements or objectives in the plan are

predicated on data that is simplistically or incorrectly stated."); In re Adana Mortgage Bankers,

Inc., 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981) ("The disclosure statement provides no financial

information, data, valuations, or projections relevant to the determination by the Creditors of

whether to accept or reject Debtor's plan.   Such financial information is the nature of that

required under Section 1125 to constitute adequate information. . . . [C]reditors are entitled to a

disclosure statement prepared by Debtor to which the Debtor is accountable. The creditors are

not expected to be mind readers or clairvoyant. The basic financial information must be supplied

in the statement.").

40.    Additionally, nowhere in the Disclosure Statement does the Debtor disclose the

amount of the balloon payment that the Plan requires the Debtor to make to AFP at the end of the

seven (7) year payment period, or how the Debtor will make this balloon payment.  Presumably,

the Reorganized Debtor will have to sell the Hotel or refinance the New Note in order to make

the required balloon payment.   Yet, the Disclosure Statement fails to disclose that the Debtor

attempted to refinance the Loan for more than three (3) years, without success.

41.    The Debtor must disclose how it will obtain the funds to make this balloon

payment.[2]

42.    Further, the Debtor fails to provide any support for its valuation of its assets

contained in its Liquidation Analysis.  Despite the fact that the evidence previously presented to

this Court strongly suggests otherwise, the Liquidation Analysis simply states that the value of

the Debtor's "Property & Equipment" is $60 million.  (See Disclosure Statement, Ex. D, note 6).

---

[2] In any event, a plan that requires a speculative future sale or refinance is not feasible as a matter of law.
See, e.g., Crestar Bank v. Walker (In re Walker), 165 B.R. 994, 1005 (E.D. Va. 1994) (finding plan was
not feasible because contingent on future sale of real property but no details regarding timeframe for or
terms of sale were provided).

Not only is this statement unsupported, but it is inconsistent with the testimony before this Court

of the Debtor's principal, William F. Dixon, wherein Mr. Dixon testified that the value of the

Hotel alone purported was approximately $60 million, but that certain undeveloped property also

owned by the Debtor had additional value, which Mr. Dixon estimated had a value of at least $10

million, and possibly as much as $85 million. (See 3/9/11 Tr. at 23:2-5, 24:17-25:4).[3]

43.    Further, the Debtor's Liquidation Analysis fails to even mention the additional

value of the undeveloped real property.  If the Debtor were to include in its Liquidation Analysis

the value of its other assets, including the conservative estimate of $10 million for the

undeveloped parcels previously testified to by Mr. Dixon, there would presumably be sufficient

funds available to distribute in a liquidation to pay non-insider trade unsecured creditors in full.[4]

44.    For these additional reasons, the Disclosure Statement cannot be approved.

**D.    The Disclosure Statement Does Not Provide Adequate Information Regarding Class 3 and Class 4 Claims.**

45.    The Disclosure Statement also fails to provide adequate or legally accurate

information regarding the proposed treatment of claims in Classes 3 and 4 under the Plan.

(i)    **Class 3 - Other Unsecured Claims.**

46.    The Plan states that the claims in Class 3, referred to as "Other Unsecured

Claims," will not receive any distribution from this estate and will be discharged as against the

Debtor, but that these claims will be transferred to and assumed by Tiburon. (See Plan, Art. III,

---

[3] The $60 million value is also inconsistent with other portions of the Disclosure Statement, wherein the Debtor states that "its going concern value is between $60 million and $65 million, for a midpoint of $62.5 million." (Disclosure Statement, § XIII.J).

[4] According to the Debtor's Liquidation Analysis, there will be a shortfall of $442,399 with respect to the payment of AFP's Allowed Claim.  Assuming an 85% liquidation value of the Debtor's Property and Equipment, the additional $10 million in asset value will add $8.5 million in "liquidation value" to the Debtor, which means that, after payment to AFP in full, there will be in excess of $8 million to pay the remaining creditors.

§ C.3). The Plan further provides that the Claims in Class 3 are impaired and entitled to vote with respect to the Plan. (See id.)

47.    First, there is absolutely no information in the Disclosure Statement about the Other Unsecured Claims, which appear to be insider claims, including (i) why these claims are unsecured claims instead of equity, (ii) when these so-called creditors' claims arose, or (iii) why these claims are being separated from general unsecured claims in the Plan. Further, there is no information in the Disclosure Statement regarding why these holders of Other Unsecured Claims are agreeing to discharge their claims against the Debtor and solely look to Tiburon for payment.

48.    Additionally, the Disclosure Statement is silent concerning Tiburon's ability to pay these claims that it is purportedly assuming. At a minimum, the Disclosure Statement must be amended to provide substantially more information regarding Tiburon, its business, its assets and its liabilities, including its ability to pay Other Unsecured Claims.[5]

49.    Additionally, the Disclosure Statement fails to explain why holders of Class 3 claims are entitled to vote on the Plan. As noted, the Plan states to holders of these claims "will not receive any distribution on account of such Claims and the Debtor and Reorganized Debtor shall be discharged, cancelled, released and extinguished from such Claims as of the Effective Date." (Plan, Art. III, § C.3). Because the holders of Class 3 claims are receiving no property from the Debtor or its estate on account of their claims, Class 3 should be deemed to have rejected the Plan as a matter of law, and the Disclosure Statement should not provide that Class 3 is entitled to vote with respect to the Plan. See 11 U.S.C. § 1126(g) ("Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that

---

[5] Given the fact that the holders of Class 3 - Other Unsecured Claims all appear to be insiders of or parties related to the Debtor, it is likely that Tiburon's assumption of these claims is illusory and Class 3 was included in the Plan solely to gerrymander votes.

the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.").

50.    For these additional reasons, the Disclosure Statement is deficient.

(ii)    **Class 4 - Indemnification Claims.**

51.    The Plan states that holders of Class 4, referred to as "Indemnification Claims," shall have their claims reinstated against the Reorganized Debtor, in the same respect as is provided pre-petition. (See Plan, Art. III, § C.4). Yet, the Plan provides that Class 4 is impaired and holders of such claims are entitled to vote on the Plan.

52.    The Disclosure Statement fails to provide sufficient information regarding Class 4, including why these creditors, who also are mostly insiders, are entitled to vote and why their claims are being separately classified from general unsecured claims.[6]

53.    Further, 11 U.S.C. § 1124(1) provides that where a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest," the claim is not impaired as a matter of law. 11 U.S.C. § 1124(1).

54.    Where a debtor has an indemnity obligation to a creditor, and a plan provides that the indemnity obligation will survive confirmation, the creditor's claim is unaltered, such that the claim is not impaired under 11 U.S.C. § 1124(1). See In re Combustion Eng'g, Inc., 295 B.R. 459, 474-75 (Bankr. D. Del. 2003), vacated on other grounds, 391 F.3d 190 (3d Cir. 2006) (holding that claim based on indemnification agreement was unimpaired and creditor was not entitled to vote on plan where any claims to arise under agreement would be pass through the bankruptcy unaltered).

---

[6] It appears that the separation of these Indemnification Claims from general unsecured claims is yet a further attempt to gerrymander votes.

55.    Given the fact that the holders of claims in Class 4 are not impaired, under 11 U.S.C. § 1126(f), these claimants are not entitled to vote with respect to the Plan as a matter of law. Yet, the Disclosure Statement is silent on this issue.

56.    Additionally, despite the fact that there are environmental issues respecting the Hotel resulting from historic gas plant operations that had been performed prior to the construction of the Hotel, which have not been remediated, for which the Guarantors agreed to indemnify AFP, the Disclosure Statement fails to disclose anything regarding these environmental issues.

57.    In fact, the Disclosure Statement fails to disclose the fact that in late May 2011, the Debtor received a letter from the New Jersey Department of Environmental Protection reminding the Debtor of its obligations under the Site Remediation Reform Act, and directing the Debtor to retain a licensed site remediation professional.

58.    For these additional reasons, the Disclosure Statement cannot be approved.

**E.    The Disclosure Statement Does Not Provide Adequate Information Regarding the Proposed Owners of the Reorganized Debtor and the Funding of the Plan.**

59.    Despite the fact that Tiburon, the current equity owner of the Debtor, is not proposing to provide any new value to the Debtor or the estate, through the Plan, Tiburon is to receive a 42.5% interest in the Reorganized Debtor on account of its pre-petition equity interest in the Debtor.

60.    Further, the Disclosure Statement fails to explain why Tiburon is retaining equity in the Debtor, in contradiction to well established and controlling law.

61.     Further, OPN and Forest Lake are to receive 42.5% and 15% equity interests, respectively, in the Reorganized Debtor.[7]  However, the Disclosure Statement fails to provide parties in interest with sufficient information regarding the identities of OPN and Forest Lake and their members.

62.     Additionally, the Plan proposes that Forest Lake will make a cash infusion of $5 million to pay for its fifteen percent (15%) ownership interest in the Reorganized Debtor.  Yet, the Disclosure Statement states only that Forest Lake will provide "up to $5 million."  Compare Plan at Art. I, § A.18 (definition of "Capital Contribution Agreement") with Disclosure Statement at VI.D (discussion of "Capital Contribution Agreement").

63.     It is imperative for creditors to know (a) exactly who OPN and Forest Lake are and (b) what OPN and Forest Lake are contributing to the Plan in return for their equity interests that they are to receive in the Reorganized Debtor.

64.     For example, the Disclosure Statement must provide disclosures about Forest Lake and OPN's financial wherewithal to make the necessary contributions required by the Plan, including providing bank account information and/or audited financial statements of these entities or their principals so as to provide parties in interest with adequate information to make an informed and rational decision with respect to the Plan.

65.     For these additional reasons, the Disclosure Statement is deficient.

---

[7] The Court may recall that during the hearing on the Debtor's motion for approval of DIP financing from OPN, the Debtor sought and obtained approval for an amendment to its operating agreement that included a transfer of 50% of the Debtor's equity to OPN.  The Disclosure Statement fails to address this.  Further, it appears that the Plan seeks approval for a further allocation of the Debtor's equity, without appropriate disclosures.

**F.     The Disclosure Statement Does not Provide Adequate Information Regarding the Releases Contained in the Plan.**

66.    Despite the fact that the Plan contains non-consensual third-party releases that are violative of the Bankruptcy Code and Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203 (3d Cir. 2000), the Disclosure Statement improperly states that the Plan provides for "customary releases." This statement, however, is misleading and inaccurate.

67.    For these additional reasons, the Disclosure Statement cannot be approved.

**G.     The Disclosure Statement Fails to Adequately Disclose the Speculative Nature of the Plan and the Many Risks Associated with the Plan.**

68.    Rather than disclose the obvious risks associated with the Plan, the Disclosure Statement instead paints an artificial picture of the Debtor's ability to effectuate the Plan and fails to include post-petition operating results. Such speculative, overly optimistic assumptions are misleading, causing the Disclosure Statement to be incapable of being approved. Cf. In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 982 (Bankr. N.D.N.Y. 1988) (rejecting disclosure statement because "it paints a positive and misleading picture unsupported by the Debtor's financial condition, the record or the Code.").

69.    For example, for the Plan to succeed, the Reorganized Debtor will have to increase the Hotel's occupancy rate by almost ten percent (10%) over the next three (3) years, such that it is able to sell nearly 9,000 more rooms in 2014 than it projects it will sell in 2011.[8] (See Disclosure Statement, Ex. B). There is, however, no factual basis to support such optimistic assumptions. Additionally, as noted, the Disclosure Statement fails to detail how the Reorganized Debtor will make the balloon payment to AFP that is contemplated under the Plan.

---

[8] The Debtor's projections for 2011 are also far more optimistic than 2010 actual results.

70.     For these additional reasons, the Disclosure Statement is incapable of being

approved.

## II.     THE PLAN IS UNCONFIRMABLE AS A MATTER OF LAW.

71.     When a plan to which a disclosure statement relates is incapable of confirmation

by virtue of its defects, those defects may properly be raised as objections to the disclosure

statement.  In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001);  In re 266

Wash. Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); In re E. Me. Elec. Coop., Inc., 125

B.R. 329, 333 (Bankr. D. Me. 1991); In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr.

S.D. Ohio 1990); In re Pecht, 53 B.R. 768, 769 (Bankr. E.D. Va. 1985); In re McCall, 44 B.R.

242, 243 (Bankr. E.D. Pa. 1984); In re Kehn Ranch Inc., 41 B.R. 832, 833 (Bankr. D.S.D. 1984).

72.     If a plan on its face cannot be confirmed, it is incumbent on a bankruptcy court to

decline approval of the disclosure statement in order to prevent the diminution in the value of the

estate that would result from the expense of soliciting votes and seeking confirmation of a

patently unconfirmable plan.  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr.

N.D.N.Y. 1988).  See also In re Quigley Co., 377 B.R. 110, 115-116 (Bankr. S.D.N.Y. 2007); In

re Filex, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990).

73.     As is set forth below, in addition to the fact that the Disclosure Statement fails to

contain "adequate information," the Plan suffers from numerous legal defects which make the

Plan patently unconfirmable as a matter of law.[9]

---

[9] AFP reserves the right to supplement its objections to the Plan, or any other future plan proposed by the
Debtor.

**A.** **The Plan Violates 11 U.S.C. §§ 1122(a) and 1129(a)(1) by Improperly Establishing Multiple Classes of Unsecured Claims in an Attempt to Gerrymander an Impaired Accepting Class.**

74.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Although this section does not explicitly prohibit separate classification of substantially similar claims, it is "clear that the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.), 987 F.2d 154, 158 (3d Cir. 1993). Courts thus require that "the classification of the claims or interest must be reasonable." Id. (quoting In re Matter of Jersey City Medical Ctr., 817 F.2d 1055, 1062 (3d Cir. 1987)).

75.      In a "cram down" case, which requires that at least one impaired class vote to accept the Plan pursuant to § 1129(a)(10), reasonable classification means that "each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10)[.]" Route 37, 987 F.2d at 159. See also Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991) ("One clear rule emerges from otherwise muddled caselaw on 11 U.S.C.S. § 1122 claims classification: thou shall not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."), cert. denied, 506 U.S. 821 (1992). "Classification of claims thus affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate 'acceptance' by artful classification." Greystone III, 995 F.2d at 1277. In re Fairfield Executive Assoc., 161 B.R. 595,

600 n.6 (D.N.J. 1993) (quoting FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd.

Partnership, 155 B.R. 93, 99 (D.N.J. 1993)) ("Unsecured claims will, generally speaking,

comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor,

because they are claimants of equal legal rank entitled to share pro rata.").

76.    Because, here, all unsecured claims have the same legal rights against the

Debtor's assets, there is no logical reason to do anything except place them in the same class.  As

a result, the Debtor's classification scheme must be seen for what it is -- a transparent attempt to

gerrymander an impaired accepting class.

77.    The Third Circuit clearly denounced such classification schemes:

> The critical confirmation requirements set out in Section
> 1129(a)(8) (acceptance by all impaired classes) and Section
> 1129(a)(10) (acceptance by at least one impaired class in the event
> of a "cram down") would be seriously undermined if a debtor
> could gerrymander classes. A debtor could then construct a
> classification scheme designed to secure approval by an arbitrarily
> designed class of impaired claims even though the overwhelming
> sentiment of the impaired creditors was that the proposed
> reorganization of the debtor would not serve any legitimate
> purpose. This would lead to abuse of creditors and would foster
> reorganizations that do not serve any broader public interest.

Route 37, 987 F.2d at 158.

78.    Furthermore, any argument that trade creditors and other unsecured creditors have

divergent interests, thereby purportedly justifying separate classification, has also been soundly

rejected by the Third Circuit:

> While this argument relates to voting, we nevertheless find it
> unpersuasive. The distinction between those who do and do not
> "truly act[] in their interests as unsecured creditors" finds no
> support in the Code and seems inconsistent with economic reality.
> Absent bad faith or illegality (see 11 U.S.C. § 1126(e) (1988)), the
> Code is not concerned with a claim holder's reason for voting one
> way or the other, and undoubtedly most claim holders vote in
> accordance with their overall economic interests as they see them.

Id. at 161.

79.    The fact that the Plan's classification scheme was created by the Debtor for the

sole transparent purpose of gerrymandering is made clear by the Debtor's improper attempts to

entitle both Classes 3 and 4 creditors, which are mostly insiders and/or entities aligned with the

Debtor, to vote with respect to the Plan.  However, as was discussed *supra*, because: (i) Class 3

is receiving no distributions under the Plan, pursuant to 11 U.S.C. § 1126(g), the holders of

claims in Class 3 are not entitled to vote and (ii) Class 4 is not impaired under the Plan, pursuant

to 11 U.S.C. § 1126(f), the holders of claims in Class 4 are not entitled to vote.

80.    The Debtor has not, and cannot, provide any reasonable justification for its

separate classification into three (3) separate classes of the so-called unsecured claims against the

Debtor's estate.  Consequently, the Plan violates 11 U.S.C. §§ 1122(a) and 1129(a)(1), thereby

making the Plan unconfirmable as a matter of law.

   **B.**    **The Plan Violates the Absolute Priority Rule by Providing Tiburon With an**
          **Ownership Interest in the Reorganized Debtor in Exchange for No New**
          **Value.**

81.    The Plan also proposes to have Tiburon, the 100% equity holder of the Debtor,

retain a 42.5% equity interest in the Reorganized Debtor solely on account of its pre-petition

equity interest in the Debtor.  For the reasons set forth below, this violates the absolute priority

rule, thereby making the Plan further unconfirmable as a matter of law.

82.    11 U.S.C. § 1129(b)(1) requires that treatment of each impaired class of claims

that has not accepted the Plan be "fair and equitable."  With respect to any class of unsecured

claims, this means that: (i) the creditors in the class receive or retain property of a value equal to

the allowed amount of their claims or (ii) no creditor or interest holder of a lesser priority

receives any distribution under the plan on account of its junior claim or interest. 11 U.S.C.

§ 1129(b)(2)(B). This requirement is colloquially referred to as the "absolute priority rule."

83.    In this case, because the Plan proposes to impair the claims of unsecured

creditors, the absolute priority rule prohibits Tiburon, the Debtor's "old" equity, from retaining

any equity interest in the Reorganized Debtor.

84.    Under what some courts refer to as the "new value exception" to the absolute

priority rule, some courts have permitted existing equity holders to retain their interests in a

reorganized debtor if old equity makes a ""new value" capital contribution as part of the plan.  In

order to invoke the new value exception to the absolute priority rule, the "qualifying new value

contribution must be (1) necessary to the reorganization; (2) in the form of money or money's

worth; and (3) reasonably equivalent to the interest retained . . . (4) substantial and (5) proffered

by the debtor at the outset, i.e., 'up front.'"  In re G-I Holdings, Inc., 420 B.R. 216, 269 (D.N.J.

2009) (citing In re Sea Garden Motel & Apts., 195 B.R. 294, 301 (D.N.J. 1996)).

85.    However, in Bank of America National Trust and Savings Assoc. v. 203 North

LaSalle Street Partnership, the Supreme Court held that, even if the new value exception to the

absolute priority rule actually exists, a debtor's plan cannot satisfy the new value exception

unless the debtor's pre-petition equity holders test the value of their proposed "new value"

contribution to the market.  526 U.S. 434, 437 (1999).  Thus, old equity many not "contribute

new capital and receive ownership interests in the reorganized entity, when that opportunity is

given exclusively to the old equity holders under a plan adopted without consideration of

alternatives."  Id.  "[T]he exclusiveness of the opportunity, with its protection against the

market's scrutiny of the purchase price by means of competing bids or even competing plan

proposals, renders the partners' right a property interest extended 'on account of' the old equity

position and therefore subject to an unpaid senior creditor class's objection."  Id. at 456.  As the

Third Circuit declared, "the exclusive opportunity to invest in the reorganized entity (and receive

equity in it thereby) must be considered property received 'on account of' the junior claim (the

equity interest)." In re PWS Holding Corp., 228 F.3d 224, 237-38 (3d Cir. 2000) (citing 203 N.

LaSalle, 526 U.S. at 458).

86.     Here, the Supreme Court's 203 North LaSalle's market test requirement prevents

the Plan from being confirmable as a matter of law.  First, Tiburon is not even making any "new

value" contribution that is reasonably equivalent to the equity interest Tiburon is retaining.

Even, if it were, the Debtor has failed to either allow other parties to bid for the equity or propose

competing plans so as to test the market, as is required by the Supreme Court.

87.     Assuming, *arguendo*, that the Court were to overlook the market test requirement

of 203 N. LaSalle to consider the proffered "new value" being provided by Tiburon, which the

Court should not, the Plan still cannot satisfy the new value exception to the absolute priority

rule.

88.     It is uncontested that Tiburon is not infusing any new capital into the Reorganized

Debtor under the Plan.  Instead, the Plan provides that Tiburon is retaining a 42.5% equity

interest in the Debtor purportedly in exchange for its assumption of the debt of Class 3 - Other

Unsecured Claims.   (Plan, Art. III, § C.5).   Thus, the purported new value contribution of

Tiburon amounts to a promise to perhaps pay insider "creditors" something in the future.  Such a

promise of a future contribution has been soundly rejected by courts and is not considered new

value.

89.     To constitute new value, the contribution from old equity "must be a present

contribution rather than a promise to pay in the future; it must be freely tradable in the market by

the debtor; and it must be an asset in the accounting sense."  In re Creekside Landing, Ltd., 140

B.R. 713, 717 (Bankr. M.D. Tn. 1992); Kham & Nate's Shoes No. 2, Inc. v. First Bank, 908 F.2d

1351, 1362 (7th Cir. 1990) (promises to guarantee debtor's obligations are not a present

contribution of money or money's worth, but instead are "intangible, inalienable and

unenforceable," and certainly not new value); In re Yasparro, 100 B.R. 91, 98 (Bankr. M.D. Fla.

1989) (issuance of promissory notes as part of plan is not a present contribution of money or

money's worth, and therefore does not constitute new value); In re Future Energy Corp., 83 B.R.

470, 499 (Bankr. S.D. Ohio 1988) (a promise to fund future distribution to unsecured creditors is

not new value, as it is a promise to do something in the future, not a present contribution); see

also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 205-06 (1988) (experience, expertise,

and promise of future labor not new value).

90.     As a result, Tiburon's assumption of certain claims and an uncertain promise that

Tiburon will pay creditors with respect to those claims at some point in the future does not

constitute new value, thereby rendering the Plan further unconfirmable as a matter of law.[10]

### C.     The Proposed Treatment of AFP's Claim Under Plan Does Not Satisfy the Cramdown Requirements of 11 U.S.C. § 1129(b)(2)(A) and Cannot be Approved Over AFP's Objection.

91.     11 U.S.C. § 1129(b)(2)(A) provides that the treatment of a secured creditor under

a cramdown plan must be "fair and equitable." This, in turn, requires that the plan provide:

> (i)(I)    that the holders of such claims retain the liens securing
> such claims, whether the property subject to such liens is retained
> by the debtor or transferred to another entity, to the extent of the
> allowed amount of such claims; and
>
> (II)      that each holder of a claim of such class receive on account
> of such claim deferred cash payments totaling at least the allowed
> amount of such claim, of a value, as of the effective date of the
> plan, of at least the value of such holder's interest in the estate's
> interest in such property;

---

[10] This is especially true, where, as here, the claims being assumed by Tiburon are held by entities related
to Tiburon and the Debtor.

. . . or

(iii) for the realization by such holders of the indubitable
equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).[11]

92.     Here, the Plan's proposed treatment of AFP's Allowed Claim is not fair and

equitable, as it fails, as a matter of law, to comply with the provisions of 11 U.S.C.

§ 1129(b)(2)(A)(i)(I).

93.     The Plan proposes to effectuate:

a partial release of Liens and security interests [] with respect to
Reorganized OPD's redevelopment of the property whereby AFP
will release and discharge its Liens or be deemed to have released
and discharged its Liens on and security interests in unimproved
parcel(s) or portions of the property selected to be subdivided and
developed by the Reorganized OPD upon payment to AFP from or
on behalf of Reorganized OPD of such amount to be set forth in
the AFP Exit Documents.

(Plan, Art. III, § C.1).

94.     Thus, simply stated, the Plan proposes to cram down AFP's Allowed Claim, but

at the same time, force AFP to enter into an nonconsensual release of portions of its Liens

against the Debtor's property, which Liens necessarily secure the entire debt owed to AFP.  Such

treatment, as a matter of law, violates 11 U.S.C. § 1129(b)(2)(A)(i)(I), which mandates that a

secured creditor retain all of the liens securing its claim in order for a proposed cramdown of that

claim to be fair and equitable.  See Core States Bank v. United Chemical Techs., Inc., 202 B.R.

33, 49-50 (E.D. Pa. 1996) (reversing confirmation of plan that had forced a secured creditor to

release a portion of its liens, even though debtor was proposing to compensate secured creditor

for its release of the liens on the specific property in question, because the plan did not provide

---

[11] 11 U.S.C. § 1129(b)(2)(A)(ii) addresses a sale of the secured creditor's collateral under a plan, and is
therefore irrelevant herein.

for the retention of liens: "the Plan fails to satisfy 11 U.S.C. § 1129(b)(2)(A)(i)(I) because it releases, without authorization or negotiation, CoreStates' machinery and equipment liens arising out of the cross collateralization").

95.    Similarly, the Plan's attempt to eliminate certain non-monetary provisions of the Loan Documents from the New Note is equally violative of 11 U.S.C. § 1129(b)(2)(A). Specifically, the Plan seeks to, "among other things," eliminate the lockbox arrangement, as well as AFP's controls over the Debtor's bank accounts and expenditures.   These non-monetary provisions of the Loan Documents are protections that were afforded to Barclay's (and now AFP) through good faith negotiations by the parties, and, meant, in addition to the liens, to further secure AFP's interests.

96.    Certainly, these non-monetary provisions of the Loan Documents have value, thereby requiring AFP to be compensated for their elimination.  Yet, the Plan does not propose to compensate AFP in any way for its loss of these valuable protections.   Because 11 U.S.C. § 1129(b)(2)(A)(i)(II) requires the Debtor to provide AFP with deferred cash payments of a value "of at least the value of [AFP's] interest" in the property, the Plan must, at the very least, provide a mechanism to compensate AFP for its loss of these valuable protections.

97.    For these reasons, as a matter of law, the Plan does not satisfy 11 U.S.C. § 11129(b)(2)(A), further causing the Disclosure Statement to be incapable of being approved.

### D.    The Injunction and Releases Provided to the Guarantors Under the Plan Violate the Bankruptcy Code.

98.    The Plan provides for certain releases and injunctions in favor of the third-party Guarantors and against AFP.  These releases and injunctions are not permitted by the Bankruptcy Code.

99.     First, it is not even clear that this Court has jurisdiction to grant the requested

third-party releases to the Guarantors. In In re Johns–Manville, 600 F.3d 135 (2d Cir. 2010), the

Second Circuit Court of Appeals confirmed that courts do not have the subject matter jurisdiction

in bankruptcy cases to enjoin non-derivative claims against third parties. Id. at 153. For a claim

to be deemed derivative, the outcome of the third-party claim must have an affect upon the res of

the bankruptcy estate. In re Johns–Manville, 517 F.3d 52, 66 (2d Cir. 2008) ("[A] bankruptcy

court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of

the bankruptcy estate.")

100.    Here, because the indemnification claims of the Guarantors against the Debtor are

to be assumed by Tiburon under the Plan, the post-Effective Date outcome of any claims AFP

may have against the Guarantors cannot directly affect the res of the bankruptcy estate.

Therefore, under the Johns-Manville line of cases, AFP respectfully submits that this Court does

not have jurisdiction to grant the releases at issue under the Plan.

101.    Even assuming, again arguendo, that this Court has jurisdiction to consider the

releases, the releases violate In Gillman v. Continental Airlines (In re Continental Airlines), 203

F.3d 203 (3d Cir. 2000). In Continental Airlines, the Third Circuit held that, even under the most

flexible tests for the validity of third party releases employed by other courts, non-consensual

releases of claims against third parties must be fair and necessary to the reorganization, and the

court approving the releases must make specific factual findings to support those conclusions. Id.

at 213-14, 217 (3d Cir. 2000) (reversing District Court's order upholding confirmation of

debtor's plan where "the Bankruptcy Court and District Court lacked sufficient evidentiary and

legal basis to authorize the release and permanent injunction of Plaintiffs' claims under any of

the standards adopted by the courts that have evaluated non-debtor releases and permanent

injunctions" because "the release and permanent injunction amounted to nothing more than a lockstep discharge of non-debtor liability").

102.    In <u>Continental Airlines</u>, the Third Circuit declared that "Section 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities" and "does not explicitly authorize the release and permanent injunction of claims against non-debtors." 203 F.3d at 211. The Third Circuit noted that some circuit courts prohibited non-debtor releases and permanent injunctions entirely, <u>id.</u> at 212 , while others permitted such releases and injunctions only in "extraordinary" circumstances involving both global settlements of massive tort liabilities against the debtors and co-liable parties and "substantial contributions" from the non-debtor parties to compensate the claimants whose claims were released and make the reorganizations feasible. <u>Id.</u> at 212-13.

103.    Here, this is not a case involving mass tort liabilities of the Debtor and co-liable parties, and none of the Guarantors are providing any contribution, albeit a substantial contribution, to the Debtor that could possibly compensate AFP for the more than $50 million in claims against each of the Guarantors that is being nonconsensually released under the Plan.

104.    As a result, the Plan cannot be confirmed as a matter of law, thereby further rendering the Disclosure Statement incapable of being approved.

**E.    The Plan Violates 11 U.S.C. § 1129(a)(3) because the Plan was not proposed in good faith.**

105.    11 U.S.C. § 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith" is not defined by the Bankruptcy Code; however, the Second Circuit has defined good faith to require that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" <u>Kane v. Johns-Manville Corp.</u>, 843 F.2d 636, 649 (2d Cir.

1988) (quoting Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d cir. 1984)). See also In re Texaco Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988).

106.    In evaluating whether a plan has been proposed in good faith, a court "may consider a [plan proponent's] pre-filing conduct as well as the feasibility of the plan itself." Toy & Sport Warehouse, Inc., 37 B.R. at 149. See also In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997). Cf. In re Resorts Int'l, 145 B.R. 412, 469 (Bankr. D.N.J. 1990) ("Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.")

107.    Additionally, courts have found that plans proposed as part of a scheme of delay lack good faith. See In re Pikes Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985) ("Not confirming the plan for lack of good faith is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."); In re Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (same); In re Consulting Actuarial Partners, Ltd. Partnership, 72 B.R. 821, 826 (Bankr. S.D.N.Y. 1987) ("In determining whether or not a Chapter 11 petition was filed with good faith lacking, the courts have focused on evidence of an intent to abuse the judicial process and the purposes of the reorganization provisions.").

108.    Here, for the many reasons discussed earlier, it is abundantly apparent that the Plan was not proposed in good faith, and therefore violates 11 U.S.C. § 1129(a)(3). As a result, the Disclosure Statement cannot be approved.

**F.**    **The Plan Violates 11 U.S.C. § 1129(a)(5).**

109.    11 U.S.C. § 1129(a)(5) requires a variety of different disclosures and approvals related to the post-confirmation management of the reorganized debtor. First, Section 1129(a)(5) requires the Plan disclose the identity and affiliations of management, owners, directors, or officers of the reorganized debtor. See 11 U.S.C. § 1129(a)(5)(A)(i).

110.    Additionally, Section 1129(a)(5) requires a plan to disclose information sufficient to allow the court to make a determination that the service of such individuals as post-confirmation management "is consistent with the interest of creditors and equity security holders and public policy." 11 U.S.C. § 1129(a)(5)(A)(ii). This second requirement allows courts "to ensure that reorganized entities will not, because of the identity, history and affiliation of their proposed management, engage in activities contrary to general public policy." 7 Collier on Bankruptcy ¶ 1129.04[5][b] (15th ed. rev. 2009). See In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984) (finding that continuation of management was not contrary to public policy where only argument raised in opposition was questionable business judgment of management pre-petition).

111.    In determining whether continued service by prior management comports with public policy, courts should consider "if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor." In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003). See also In re Polytherm Indus., Inc., 33 B.R. 823, 829 (W.D. Wis. 1983); In re Sherwood Square Assoc., 107 B.R. 872, 878 (Bankr. D. Md. 1989).

112.    11 U.S.C. § 1129(a)(5)(B) also requires a plan proponent to disclose the identity and nature of compensation that will be provided to any insider that will be employed by the reorganized debtor.

113.    Here, the Plan fails to comply with 11 U.S.C. § 1129(a)(5)(B) because the
continuing service of prior management of the Debtor does not comport with public policy and
the Plan fails to disclose the nature of any compensation that will be provided to any insiders that
will be employed by the Reorganized Debtor.

**G.    The Plan Violates 11 U.S.C. § 1129(a)(7) Because the Plan Is Not in the Best
Interests of Creditors.**

114.    11 U.S.C. § 1129(a)(7) is known as the "best interest of creditors" test. See Kane
v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).  This section's application is limited
to impaired classes of claims or interests and mandates that, in order for a plan to be confirmed:
(1) every member of every class must have accepted it or (2) each member that voted against it
must receive at least the liquidation value of its claims.  See 11 U.S.C. § 1129(a)(7).  "Thus,
under the best interests test, a court 'must find that each [non-accepting] creditor will receive or
retain value that is not less than the amount he would receive if the debtor were liquidated.' " In
re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (quoting In
re Victory Constr. Co., Inc., 42 Bankr. 145, 151 (Bankr. C.D. Cal. 1984)).

115.    In order to determine if a plan is in the best interest of a class voting against it, the
plan must provide a sufficient and valid liquidation analysis upon which creditors can rely.  See
id.; In re Modern Steel Treating Co., 130 B.R. 60, 64 (Bankr. N.D. Ill. 1991) (noting that without
a liquidation analysis, the requirements of Section 1129(a)(7) cannot be met).  Moreover, the
hypothetical liquidation analysis that must be included in the plan must be based upon evidence,
not assumptions of the plan proponents, in order for it to satisfy the best interests of creditors
test.  In re MCorp. Fin., Inc., 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992).

116.    Here, as noted *supra*, the Plan and Disclosure Statement fail to provide adequate
financial information and a sufficient liquidation analysis.  As a result, the Plan violates 11

U.S.C. § 1129(a)(7), and cannot be confirmed as a matter of law, thereby further making the

Disclosure Statement incapable of being approved.

### H.    The Plan Violates 11 U.S.C. § 1129(a)(11) because the Plan is speculative and not feasible.

117.    11 U.S.C. § 1129(a)(11) requires a plan to be "feasible." Pursuant to this section,

a plan is deemed feasible if, post-confirmation, it "is not likely to be followed by the liquidation,

or the need for further financial reorganization, of the debtor . . . unless such liquidation or

reorganization is proposed in the plan."    11 U.S.C. § 1129(a)(11).    Thus, the court must

scrutinize the plan to determine if there is a "reasonable assurance of success." Kane v. Johns-

Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988).

118.    In making a feasibility determination, courts consider:

> (1) the adequacy of the capital structure; (2) the earning power of
> the business; (3) economic conditions; (4) the ability of
> management; (5) the probability of the continuation of the same
> management; and (6) any other related matters which determine
> the prospects of a sufficiently successful operation to enable
> performance of the provisions of the plan.

In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984) (quoting In re

Landmark at Plaza Park, Ltd., 7 B.R. 653, 659 (Bankr. D.N.J. 1980)). This list of factors is

"neither exhaustive nor exclusive."    In re Drexel Burnham Lambert Group Inc., 138 B.R. 723,

763 (Bankr. S.D.N.Y. 1992).

119.    It is well settled that a plan premised upon speculation and contingencies does not

satisfy the Section 1129(a)(11) feasibility standard. See In re Mid-State Raceway, Inc., Case No.

04-65746, 2006 Bankr. LEXIS 3950, at *57 (Bankr. N.D.N.Y. Feb. 10, 2006) (quoting Pizza of

Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985))

("[T]he Court must 'prevent confirmation of visionary schemes which promise creditors and

equity holders more under a proposed plan than the debtor can possibly attain after

confirmation.'"); In re Kent Terminal Corp., 166 B.R. 555, 562 (Bankr. S.D.N.Y. 1994 ) ("It

goes without saying that an effective reorganization cannot be based solely on speculation.").

See also In re Sound Radio, Inc., 93 B.R. 849, 855 (Bankr. D.N.J. 1988) (quoting In re Clarkson,

767 F.2d 417, 420 (8th Cir. 1985)) ("'Sincerity, honesty and willingness are not sufficient to

make the plan feasible, and neither are visionary promises.'").

120.    Here, although not disclosed in the Plan or the Disclosure Statement, the success

of the Plan is contingent upon both a future speculative refinance or sale of the Hotel by the

Reorganized Debtor, and upon the occurrence of aggressive, overly optimistic projections by the

Debtor as to the Hotel's future financial results.[12]    Such overly optimistic and speculative

projections are insufficient for this Court to determine that the Plan is feasible as a matter of law,

thereby making the Disclosure Statement incapable of being approved.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, AFP respectfully requests that the Court

deny approval of the Disclosure Statement, and grant AFP such other and further relief as the

Court deems just and equitable.

Dated: August 8, 2011
Morristown, New Jersey

RIKER DANZIG SCHERER HYLAND
& PERRETTI, LLP

By:    /s/ Joseph L. Schwartz
            Joseph L. Schwartz

Counsel to AFP 104 Corp.

4158780.2

---

[12] As noted, for more than three (3) years, the Debtor attempted to refinance the Loan, without success.